[No. 1782]

## THE STATE OF NEVADA, RESPONDENT, *v.* JAMES THOMPSON AND W. M. McCABE, APPELLANTS.

1. CRIMINAL LAW—"ATTEMPT TO COMMIT CRIME."

An attempt to commit a crime contains three elements—the intent, the performance of some act toward its commission, and failure of consummation.

2. CRIMINAL LAW—INTENT—EVIDENCE.

Where a specific intent is a material element of an offense, it need not be proved by positive or direct evidence, but may be inferred from the conduct of the parties and other facts and circumstances disclosed by the evidence.

3. LARCENY—ATTEMPT TO STEAL—EVIDENCE.

Evidence *held* to warrant a conviction of attempting to commit grand larceny in feloniously attempting to sever gold-bearing ore from the realty of a mining claim.

4. CRIMINAL LAW—APPEAL—EVIDENCE.

A conviction will not be disturbed on appeal where the evidence is conflicting and there is substantial evidence to support it.

NORCROSS, C. J., dissenting.

APPEAL from the District Court of the First Judicial District of the State of Nevada, Esmeralda County; *F. P. Langan*, Judge.

James Thompson and another were convicted of an attempt to commit grand larceny, and they appeal. **Affirmed.**

The facts sufficiently appear in the opinion.

*Frank J. Hangs*, for Appellants:

I. An attempt to commit a crime must include some overt act or the intent must be proved beyond a reasonable doubt. This court has already passed upon what is necessary in such a case. In the case of *State of Nevada* v. *Lung*, 21 Nev. 209, this court entered into a full discussion of what constituted an attempt and cited a number of authorities to support its view of the matter. In addition to the authorities there cited the court's attention is called to the following: *State* v. *Angelo*, 18 Nev. 425; *State* v. *Taylor*, 84 Pac. 82; *People* v. *Fleming*, 29 Pac. 647; *People* v. *Mize*, 22 Pac. 80; *People* v. *Sites*, 75 Cal. 570; *People* v. *Murray*, 14 Cal. 159; *Hicks* v. *Comm.*, 19 Am. St. Rep. 891; *Stabler* v. *Comm.*, 4 Am. Rep.

653; *State* v. *Doran*, 105 Am. St. Rep. 278; *People* v. *Young*, 80 Am. St. Rep. 763; *State* v. *Mitchell*, 93 Am. St. Rep. 582: *State* v. *Gardner*, 43 Am. St. Rep. 741; *State* v. *Lee Kong*, 29 Am. St. Rep. 165; *People* v. *Jaffa*, 9 L. R. A. 263; 1 Bishop, Crim. Law, secs. 731–736; 1 Wharton, Crim. Law, sec. 180. That the intent must be clearly proven admits of no doubt in this state. (*State* v. *Clifford*, 14 Nev. 72; *State* v. *Zichfeld*, 23 Nev. 315; *State* v. *Miller*, 88 Am. St. Rep. 600, note on "Intent"; *Carter* v. *State*, 28 Am. St. Rep. 949.)

II. The court permitted improper and unfair cross-examination of the defendants. When a defendant takes the stand he is subject to the same kind of a cross-examination as any other witness. (*State* v. *Cohn*, 9 Nev. 179; *State* v. *Huff*, 11 Nev. 17; *Buckley* v. *Buckley*, 12 Nev. 424, 14 Nev. 262; *People* v. *Miller*, 33 Cal. 99; *State* v. *Judiesch*, 96 Iowa, 249; *Gale* v. *People*, 26 Mich. 157; *State* v. *Larch*, 12 Or. 99; *People* v. *O'Brien*, 66 Cal. 602.)

*R. C. Stoddard*, Attorney-General, for Respondent:

I. When a person is engaged in doing an unlawful thing the intent to commit a crime may be drawn from his unlawful acts, but if he is engaged in doing something absolutely lawful, then a specific intent must be shown to have existed, in order to establish the crime. (*State* v. *McGinnis*, 6 Nev. 109; *U. S.* v. *Darton*, 6 McLean, 46; *U. S.* v. *Baldridge*, 11 Fed. 552; *Hoover* v. *State*, 59 Ala. 42; *Mullen* v. *State*, 82 Ala. 42; *State* v. *Jones*, 70 Iowa, 505; *Comm.* v. *Bull*, 76 Ky. 656; *State* v. *Goodenow*, 65 Me. 30; *State* v. *Kortgaard*, 62 Minn. 17; *State* v. *Hall*, 85 Mo. 669; *People* v. *Herick*, 13 Wend. 87; *State* v. *Presnell*, 34 N. C. 103; *State* v. *Smith*, 93 N. C. 516.)

By the Court, SWEENEY, J.:

Defendants were jointly indicted, tried and convicted for the crime of attempt to commit grand larceny. From the judgments and orders denying their motion for new trial, each has appealed.

The indictment is in two counts. Conviction was had upon the second count, which charges that defendants "did wilfully, unlawfully and feloniously attempt to sever from the realty of

the Red King mining claim, * * * the property of the Florence-Goldfield Mining Company, a corporation, the Goldfield Syndicate Mining Company, a corporation, Lewis H. Rogers, *et al.*, * * * gold-bearing ore, then and there being of the value of $100, and to convert the same into personal property, with the intent to feloniously steal, take and carry away the same, and in pursuance of said attempt, they and each of them did then and there enter the underground workings on said Red King mining claim, * * * but said defendants, and each of them, failed in the perpetration of the said grand larceny."

Counsel for appellant relies mainly upon the contention that the evidence does not support the verdict. There is little, if any, substantial conflict in the testimony. The defense did not attempt to deny or dispute any of the evidence offered by the state, and the state offered no evidence in rebuttal of the testimony offered by the defendants.

Lewis H. Rogers, a witness for the state, testified in reference to the underground workings of the Red King mining claim, the property of the Florence-Goldfield Mining Company, and upon which the Goldfield Syndicate Mining Company, the witness Rogers and others had been operating a lease. He testified that, at the time of the alleged offense, on the 300-foot level of said claim and lease, in a winze about thirty-five feet in depth, there was a streak of ore about six inches wide that would run about two thousand dollars to the ton; that in a stope about sixty feet long upon the 400-foot level, averaging from three to five feet wide of ore that would run $110 to the ton, there was a streak of very rich ore about two inches wide, and in places five or six inches wide, that would run about $10 a pound; that the ore in these high-grade streaks was very hard, contained some bismuth, was quite black, some of it as black as coal.

Mr. C. O. Lovell testified that he was a deputy sheriff; that on the night of the alleged offense he was on the 300-foot level of the Rogers Syndicate lease, in a drift beyond the shaft, and that one Thomas Ramsey was with him; that they were behind a bulkhead at the end of the drift near the shaft, placed there for the purpose of preventing the débris falling

into the shaft; that about 9 o'clock in the evening, or shortly before, he saw the defendants coming down the shaft from the Rosebud shaft; that he saw them first when they came to a short crosscut that was probably thirty feet from the shaft; that they held the candle up and peered down this crosscut, then they came to the station, and Mr. Thompson climbed over the bulkhead where the witness was, and Mr. McCabe remained at the station of the shaft; that when the defendant Thompson climbed over the bulkhead, witness Lovell told him to throw up his hands, which he did, after which a .38 double-action Colt gun was taken from him; that immediately upon the witness telling Thompson to throw up his hands, the defendant McCabe went back in the direction from whence he came; that the defendant Thompson was taken to the station of the shaft where a prospector's pick and two large canvas ore sacks were taken from him; that he was then taken to the surface and his candlestick and candle taken from him; that he did not at the time nor subsequently make any statement to the witness concerning his presence in the mine; that he was one of a party that took the defendant Thompson to jail about 10 o'clock that night.

E. W. Gardner, a witness for the state, testified that he was a deputy constable; that he saw the defendant Thompson when he was brought up to the Rogers Syndicate shaft by the witness C. O. Lovell; that thereafter he went to the Rosebud shaft, and about twenty minutes or half an hour later than the defendant Thompson was brought to the surface, he saw the defendant McCabe come out of the shaft of the Rosebud lease on the O. K. Fraction claim, this shaft being about three hundred feet from the Rogers Syndicate shaft. Asked to describe the circumstances of the defendant McCabe coming from the shaft, his arrest, etc., the witness stated: "Well, he approached the top, got within a few feet or a couple of feet of the top; why he halted there and called for 'Charley' several times. He got no answer and stayed there in the shaft. He raised up the trap door and jumped out, and we placed him under arrest, * * * told him to throw up his hands. He threw them up and Officer Colwell searched him and then he asked him who 'Charley' was, and he said, 'Well,

he intended that name, in speaking, he intended that name
for him.' He says, 'I intended to call you Charley.' Colwell
said, 'How did you know my name?' He said, 'I guessed it.'
He didn't make any statement concerning his presence there
in this exit from the shaft at that time, nor subsequently
to me." The witness further testified he was present when
defendant McCabe was searched; that all he saw taken from
him was a candlestick containing half or three-quarters of a
candle.

The witness Burns M. Colwell testified, upon the part of the
state, that he was a deputy sheriff; that he saw the defendant
Thompson when he came out of the Rogers Syndicate shaft
with Officer Lovell; that he saw defendant McCabe when he
came out of the Rosebud shaft; that he searched him and
found upon him a candlestick containing part of a candle;
that neither then nor at any subsequent time did the defend-
ant McCabe make any statement to him concerning his pres-
ence there; that before he came out of the shaft he heard him
say, "Open the door, Charley," to which no reply was made.
"He opened the door and looked out; I could see his head
come out, then he shut the door again and went down, went
out of sight. It was probably ten minutes before he opened
it again and walked out. I asked him who 'Charley' was,
something to that effect, and he said he was speaking to us to
open the door. I did not know him prior to that time."

Witness J. F. Lone, upon the part of the state, testified to
the effect that permission had not been granted defendants to
enter upon the Rogers Syndicate lease.

Thomas G. Lockhart, upon the part of the state, testified
that the Red King mining claim was the property of the
Florence-Goldfield Mining Company; that upon the 400-foot
level of the Little Florence lease, on the Red King claim,
there was a very small streak of very high-grade ore, one
place about the width of a finger; that the tunnel connecting
the 300-foot level of the Rogers Syndicate lease and the
O. K. Fraction was upon Merger property; that on the under-
ground workings of the Red King mining claim one could not
enter any other outside property except the tunnel that leads
into the O. K. Fraction.

Upon the part of the defendants, the following testimony was offered:

Defendant J. R. Thompson, in his own behalf, testified substantially as follows: That on the evening of December 9, 1907, he went underground through the O. K. Fraction, or Rosebud shaft; that he went down for the purpose of looking over the property with a view of leasing; that one F. O. Altinger was connected with him in desiring to obtain a lease; that he was not familiar with the underground workings of the Rogers Syndicate lease; that he did not know that he was ever in the workings of the said lease; that no one authorized him to go down the shaft of the O. K. Fraction, nor did he ask any one permission so to do; that he did not then know who owned the ground he was on that night; that he went down the shaft about 6 o'clock in the evening; that if the the ground proved to be good for leasing purposes he intended to find out afterwards to whom it belonged; that he did not think any one had the lease on the Rosebud shaft; that he knew the shaft by the name being over it; that he made some inquiries around town as to who owned the Rosebud shaft, but did not find any one who knew; that from the time he went down the shaft until he was arrested he was investigating every drift, every crosscut, and every level there was in the shaft; that he had only one candle which he burned all the time; that the only man he thinks he asked as to who owned the ground, or whether it was idle, was a man named Donnelly who was well acquainted around there; that the last he heard of Donnelly he was in Rawhide.

W. M. McCabe, one of the defendants, testified in effect as follows: That he met defendant Thompson downtown on the evening of December 9th, and that Thompson asked him to go out and look at a piece of property; that he, Thompson, said he wanted to go and look for a lease if he could find one; that at Thompson's request and for that purpose he went down the Rosebud shaft; that he ran when Thompson was arrested because he was scared; that he was a miner by occupation; that he had been in the Goldfield district about a year and a half prior to that time; that he had been employed in the Gold Bar Extension, the Mohawk Florence

and the Jumbo Ledge mines; that the Mohawk Florence was just adjoining or very near the Rosebud shaft; that the Rosebud was working for a time while he was employed on the Mohawk Florence; that he did not know the Rosebud lease was on Florence ground; that when he worked for the Mohawk Florence, the Rogers Syndicate lease was working part of the time; that the Rogers Syndicate shaft was distant five hundred or six hundred feet, if not more, from the Mohawk-Florence shaft.

F. O. Altinger, a witness upon the part of the defendant, testified as follows: That he was acquainted with the defendant Thompson; that he was formerly an assayer and pretty well acquainted with the mines; that about thirty days prior to the 9th day of December, 1907, he had a conversation with Mr. Thompson in which he told him that if he could find a good lease which stood a first-class chance of getting ore, he, Altinger, could raise from five to ten thousand dollars to work it with; that, about the 1st of December, Thompson came to him saying he had a proposition of a lease on Combination Fraction, which was formerly let to Davis; that he turned down the proposition, asserting that he did not consider it good on account of being too expensive, and that the parties he had in view to go in with him preferred a lease on Florence property; that he told Thompson that if he could get anything around the Florence or on the Florence that had a good showing, he, Altinger, could get the money; that Thompson then spoke to him about a lease he thinks on the O. K. Fraction, adjoining the Rogers Syndicate, and that he told him, Thompson, that if he could get that he could get plenty of money; that he had had such conversation with others besides Mr. Thompson; that when Thompson first came to him, it was in regard to the Loftus-Davis lease; that Thompson never made a statement to him that he had negotiated for a lease on the Florence; that he suggested the Florence to Thompson, but that he did not suggest that he go out and go down the shaft and examine the workings.

C. C. Inman testified upon the part of the defense as follows: The he was the constable of Goldfield district and was such on the night of December 9, 1907; that he was

acquainted with defendant Thompson; that at that time
Thompson was a deputy constable and had authority to carry
a revolver; that Thompson was appointed a deputy constable
for the purpose of fire police, and fire warden for gasoline
stoves and such things, for the purpose of helping to prevent
fires.

The indictment in this case is based upon the provisions of
section 158 of the crimes and punishments act (Comp. Laws,
4749), which reads: "Every person who shall attempt to
commit a public offense, and in such attempt shall do any
act toward the commission of such offense, but shall fail in
the perpetration thereof, or shall be prevented or intercepted
in executing the same, upon conviction thereof, shall, in cases
where no provision is made by law for the punishment of such
attempt, be punished," etc.

In an attempt to commit a crime, three elements are
involved: First—The intent to commit the crime. Second—
Performance of some act towards its commission. Third—
Failure to consummate its commission. (*Graham* v. *People*,
181 Ill. 477, 488; *People* v. *Fleming*, 94 Cal. 308; *Jones* v.
*State*, 90 Ala. 628; *Hicks* v. *Commonwealth*, 86 Va. 223, 19 Am.
St. Rep. 891; 12 Cyc. 177; 3 Am. & Eng. Ency. Law, 2d ed.
250, 254; 3 Ency. Pl. & Pr. 97.)

It may be conceded in this case that if the evidence is suf-
ficient to prove an intent to steal upon the part of the defend-
ants, that all the elements of the offense are sufficiently
established to warrant the conviction. Failure to consum-
mate the alleged, or any, offense is manifest. The entrance
upon the underground workings of the mine without permis-
sion was doubtless sufficient to constitute the performance of
an act towards the consummation of the offense, conceding the
evidence sufficient to establish the unlawful intent.

The only question for determination is whether there are
facts and circumstances disclosed by the evidence in the case
warranting the jury in finding the felonious intent to commit
grand larceny. From the facts that the defendants were
clandestinely prowling in the mine which they knew belonged
to others and without permission from the owners, in the
nighttime with a prospector's pick and two large ore sacks;

that instead of making any reasonable excuse for their presence in the mine the one who had the opportunity took flight, and then instead of going directly out of the mine, stealthily put his head out of the shaft, called "Charley," went back out of sight and waited, and when he finally came out and was apprehended, made an untruthful statement that by using the name he intended to call the officer whom he did not know and who did not have that name, that he did not know what mine he was in except that he saw the name over the shaft he had entered, the proof that there was ore in the mine worth from one to ten dollars a pound, and other circumstances proved by the state, we cannot say that there was not some substantial evidence which a jury might consider as warranting a verdict of guilty, notwithstanding the claim made by the defendants on the trial that they went into the mine for the purpose of examining it with the intention of trying to obtain a lease if the ground looked favorable.

It is well settled by this and other courts that, where the evidence is conflicting, a verdict will not be disturbed where there is substantial evidence to support it. It was the province of the jury to weigh the evidence and determine the credibility of the witnesses. (*State* v. *Yellow Jacket S. M. Co.*, 5 Nev. 415, 418, 419; *Solen* v. *V. & T. R. R. Co.*, 13 Nev. 106; *Welland* v. *Williams*, 21 Nev. 230; *Simpson* v. *Williams*, 18 Nev. 432; *Reed* v. *Reed*, 4 Nev. 395; *Lewis* v. *Wilcox*, 6 Nev. 215; *Bryant* v. *Carson Lumbering Co.*, 3 Nev. 313; *Winter* v. *Fulstone*, 20 Nev. 260; *Watt* v. *Nev. Cent. R. R. Co.*, 23 Nev. 154, 165; *Carlyon* v. *Lannan*, 4 Nev. 156; *Murphy* v. *S. P. R. R. Co.*, 31 Nev. 120; *State* v. *Buralli*, 27 Nev. 56; *State* v. *Wong Fun*, 22 Nev. 336; *State* v. *Marks*, 15 Nev. 38.)

As in any other case where the intent is material, the intent need not be proved by positive or direct evidence, but may be inferred from the conduct of the parties and the other facts and circumstances disclosed by the evidence.

If the conduct of the parties, considered in connection with the surrounding circumstances of the case, is indicative of the felonious intent charged in the indictment and leaves no reasonable doubt in the minds of the jury regarding such intent, the felonious intent is sufficiently established. To hold

otherwise, would tend to put a premium on crime, render property rights and lives less secure, and aid criminals in escaping just punishment for their crimes or attempts to commit them.    (*State* v. *Ah Chuey*, 14 Nev. 79; *State* v. *Clifford*, 14 Nev. 72; *State* v. *Cardelli*, 19 Nev. 319; *State* v. *Espionozei*, 20 Nev. 209; *Sipple* v. *State*, 46 N. J. Law, 197; *Griffin* v. *State*, 26 Ga. 493; *State* v. *Jones*, 70 Iowa, 508.)

The judgment and order of the lower court overruling appellant's motion for a new trial are affirmed.

TALBOT, J.:  I concur.

NORCROSS, C. J., dissenting:

I am unable to concur in the view taken of this case by my associates, as I deem the evidence insufficient to support the verdict.

In *Commonwealth* v. *Merrill*, 14 Gray, 415, 77 Am. Dec. 336, cited in *Jones* v. *State*, 90 Ala. 628, 8 South. 383, 24 Am. St. Rep. 850, the court said: "The nature of the charge presupposes that the intent of the prisoner was not carried out.    It is therefore necessary that the acts and conduct of the prisoner should be shown to be such that there can be no reasonable doubt as to the criminal intent.    If these acts and conduct are equivocal, or equally consistent with the absence of the felonious intent charged in the indictment, then it is clear that they are insufficient to warrant a verdict of guilty."    See, also, *Saddler* v. *State*, 12 Tex. App. 194.

"These decisions proceed on the well-established rule in criminal cases that the proof is insufficient to warrant a verdict of guilty if the conduct of the accused is, upon a reasonable hypothesis, consistent with his innocence.    If the evidence raises a mere suspicion, or, admitting all it tends to prove, defendant's guilt is left in uncertainty, or dependent upon conjecture or probabilities, the court should instruct the jury to acquit.    The evidence should be of such character as to overcome, *prima facie*, the presumption of innocence."    (*Jones* v. *State, supra.*)

The intent of the defendants must be determined from their acts and conduct.    (*People* v. *Fleming*, 94 Cal. 308, 29 Pac. 647.)

In *State* v. *Lung,* 21 Nev. 215, this court, by Bigelow, J., said: "The overt act which constitutes an attempt must be one which manifests an intention to commit the crime. (*Cunningham* v. *State,* 49 Miss. 685.) A man's intentions must be judged by his acts. In attempts, his act must have been one which, under all circumstances, manifests an intention to commit that particular offense. (1 Whart. Crim. Law, 176.) It is essential, too, that the act of endeavor should be intrinsically adapted to effect the purpose, and, that the court and the accused may see that it is so adapted, it shall be specifically stated in the indictment. (*State* v. *Wilson,* 30 Conn. 504.) * * * Whether certain facts constitute crime is not only a question of law, but one that is often intricate and difficult of solution."

The evidence against defendants in this case is all circumstantial. To warrant the conviction of defendants, "all the circumstances proved must be consistent with each other, consistent with the hypothesis that the accused is guilty, and at the same time inconsistent with the hypothesis that he is innocent, and with every other rational hypothesis except that of guilt." (12 Cyc. 488.) However, "no general rule can be laid down as to the quantity of circumstantial evidence which in any case will suffice." (Cyc., *supra.*)

In the case of *State* v. *Mandich,* 24 Nev. 336, 343, this court, by Bonnifield, J., said: "If the circumstances, all taken together, exclude to a moral certainty every hypothesis but the single one of guilt, and establish that one beyond a reasonable doubt, they are sufficient."

Defendants in this case testified to a state of facts which, if true, explained their presence in the mine as being devoid of criminality. The facts relied upon by the state as constituting circumstances which warranted the conclusion of criminality were not manifestly inconsistent with the innocent purpose which defendants testified was theirs in going into the mine. The testimony of the witness Altinger tended to corroborate that of the defendants themselves. As before stated, the prosecution offered no evidence in rebuttal of that offered by the defendants, but conceding, for the purposes of this case, that the jury was not impressed with the truth of

the testimony offered by the defendants and for that reason they rejected it, nevertheless the defendants were at all times during the progress of the trial under the presumption of innocence, a presumption which the law itself very wisely imposes, and which the prosecution in every criminal case is bound to overcome by evidence which shall leave in the minds of the jury no reasonable doubt of the defendant's guilt. Where, as in this case, the evidence relied upon by the state is circumstantial, it must be such as to warrant no other reasonable deduction than the guilt of defendants. If a reasonable hypothesis, consistent with innocence, may be gathered from the evidence, a verdict of guilty ought not to be returned, and, if returned, ought to be set aside. (*Black* v. *State*, 112 Ga. 29, 37 S. E. 108.) Not that the verdict may not possibly be right, but because the liberty of a citizen is too sacred a right to be taken away when a reasonable hypothesis of innocence also exists.

The evidence shows in this case without contradiction that the defendants did not enter directly upon the property from which the indictment charged that they intended to steal, take, and carry away valuable ore, but, upon the contrary, that they went underground through a shaft upon an adjoining claim. There is no evidence showing or tending to show that the defendants or either of them knew of the underground connection between the Rosebud shaft in the O. K. Fraction claim, and that of the Rogers Syndicate shaft, in the Red King mining claim. There is no evidence in the record showing, or tending to show, that the defendants or either of them, knew of the existence of the high-grade ore upon the 300- and 400-foot levels of the Rogers Syndicate lease, testified to by the witness Rogers, unless it can be inferred as a reasonable deduction from all the circumstances of the case. A jury would not be warranted in supplying such an important fact by resorting to mere speculation. Knowledge upon the part of defendants of the existence in the mine of ore of value sufficiently high to make it physically possible for them to commit grand larceny might be inferred from other circumstances if they were of such character as to justify only the inference of a guilty intention. That the circumstances in

this case, as detailed by the witnesses for the state, warrant only an inference of a guilty intent, is a matter open to serious question.

The testimony shows that the defendants were trespassing upon the property of the Florence-Goldfield Mining Company and the Rogers Syndicate lease; that Thompson had in his possession two large canvas ore sacks, a small hand-pick, known as a "prospector's pick," and a revolver. Whatever unfavorable inference might be drawn from the circumstance that Thompson was carrying a revolver was neutralized by the testimony of the constable, Claude Inman, that the defendant Thompson was himself a deputy constable, and, as such, was authorized to carry a revolver. It may be conceded that, with what is known as a prospector's pick, one could sever from a small seam of very hard rock, such as was testified the high-grade ore was, an amount of such ore sufficient to have value enough to bring it within the limits of grand larceny; nevertheless, such a pick is not ordinarily used for such a criminal purpose, and may be, and usually is, used for the purpose indicated by its name, that of prospecting and sampling mining property. The mere fact that one was found in a mine with such an instrument upon him, even though he were a trespasser, would not ordinarily indicate a criminal intent upon the part of the possessor of the pick. If, however, there were other incriminating circumstances, it, of course, would also be a circumstance to be considered with the others, and if all, taken together, were sufficiently strong to leave no reasonable doubt of defendant's guilt, a conviction would not be disturbed.

The two ore sacks found in the possession of the defendant Thompson, like the prospector's pick, may be used to effectuate a criminal purpose, but, upon the other hand, they are not ordinarily so used. Their size may be regarded as a circumstance to be considered with the other circumstances in the case, and the jury might very properly consider that smaller sacks were more generally used for sampling purposes, and such fact would be entitled to such consideration as it was worth, depending for its weight very largely upon all the other facts and circumstances in the case. So far as

the defendant McCabe is concerned, it nowhere appears that he was possessed of anything other than a candlestick containing a part of a candle with which to assist his codefendant in the accomplishment of the alleged attempted grand larceny.

The disappearance or flight of McCabe when he heard his companion, Thompson, ordered to "throw up his hands," after the latter had climbed over the bulkhead of the drift, was a circumstance proper for the jury to consider, in connection with his explanation that he "ran because he was scared"; also the circumstance surrounding his exit from the Rosebud shaft. "The flight or concealment of the accused raises no presumption of law that he is guilty, but it is a fact which may be considered by the jury, and from which they may draw an inference, in connection with other circumstances, and in the absence of an explanation of the reasons or motives which prompted it, that he is guilty, and evidence of flight or concealment is admissible, whether the other evidence of guilt be direct or circumstantial." (12 Cyc. 395.)

The fact that defendants were found in the mine in the early portion of the night rather than in the daytime was also a circumstance to be considered in connection with all the other circumstances of the case. In considering this circumstance, however, it should be weighed in connection with the fact that conditions of light and darkness within the mine are the same whether it be daytime or nighttime. The weight to be given to this circumstance would have to depend very largely upon its association with other facts and circumstances. For example, a person, without permission, going into a mine to examine the same for a purpose not criminal, either because of convenience or preference, might choose reasonably the evening rather than an earlier portion of the day; hence, a circumstance of this kind, like all others, should be carefully weighed in accordance with the rule governing circumstantial evidence.

It was brought out in the testimony by witnesses upon the part of the state that neither of the defendants at the time of their arrest, or subsequently, made any statement to the arresting officers concerning their presence in the mine.

There is nothing in the facts of this case which would warrant any inference of guilt from this circumstance. Nor is it a circumstance that could properly have been given any weight when considered by the jury together with the other circumstances in the case. There is nothing in the evidence showing that when defendants were arrested they were called upon to explain their presence in the mine, or that they were at the time charged with the offense for which they were afterwards indicted, or any other offense. Many authorities hold that a person under arrest has a right to keep silent, and that a failure to deny statements made in his presence, implicating him in the alleged crime, cannot be offered in evidence against him; that no inference against him is warranted by failure to deny the truth of such statements. (*Commonwealth* v. *McDermott*, 123 Mass. 440, 25 Am. Rep. 120; *State* v. *Weaver*, 57 Iowa, 730, 11 N. W. 675; *Gardner* v. *State*, 34 S. W. 945; *State* v. *Epstein*, 25 R. I. 131, 55 Atl. 204.)

Other authorities take a less restricted view and hold that, under certain circumstances, the fact that a person charged with crime is under arrest does not necessarily exclude testimony showing that he remained silent when incriminating statements were made in his presence. (*Murphy* v. *State*, 36 Ohio St. 628; *Green* v. *State*, 97 Tenn. 50, 36 S. W. 700; *People* v. *Koerner*, 154 N. Y. 374, 48 N. E. 730.)

In *People* v. *Koerner, supra,* the court said: "The rule in regard to admissions inferred from acquiescence in the verbal statements of others is to be applied with careful discriminations, as was said by Best, C. J., in *Child* v. *Grace*, 2 C. & P. 193: 'Really, it is most dangerous evidence.' It should always be received with caution, and ought not to be admitted unless the evidence is of direct declarations of a kind which naturally call for contradiction, or some assertion made to a party with respect to his rights, in which, by silence, he acquiesces."

In any view of the law, it not appearing that any statements were made in the presence of defendants, there is nothing in this case showing or tending to show that the silence of defendants, when arrested, could be regarded as an admission, nor could it be considered as a circumstance

warranting the jury in drawing any unfavorable inference whatever.

Counsel for the state quotes from the syllabus of the case of *State* v. *McGinnis*, 6 Nev. 109, the following rule, and contends that it is applicable to the case at bar: "Criminal intent can only be proven as a deduction from declarations or acts. When the acts are established, the natural and logical deduction is that defendant intended to do what he did do, and, if he offers no excuse or palliation of the acts done, such deduction becomes conclusive."

In the McGinnis case, *supra*, there was evidence tending to establish the facts that the defendant struck one Knox on the head with a heavy pistol, and that Knox was thereby injured. From these facts, the court very properly held that "the only natural or logical deduction as to the intention of defendant therefrom was that he intended to do what he did do, and such became conclusive when he offered no excuse or palliation of the act done." The crime charged was an assault with a deadly weapon with intent to inflict upon the person of another a bodily injury. The heavy pistol, whether loaded or not, when used as a club upon the person of another, was a deadly weapon. With this deadly weapon an assault was shown to have been committed and a bodily injury inflicted; manifestly, the intent to do what actually was done was the natural and legal deduction from the acts themselves.

It is a familiar rule of law that a man is presumed to intend the natural and probable consequences of his own deliberate acts. This presumption goes no further. The defendants in this case unquestionably committed a trespass upon the mining property in question. Such a trespass, however, is not in itself a crime under the statutes of this state. (*Strozzi* v. *Wines*, 24 Nev. 389.)

It does not naturally or legally follow that, because they committed a trespass, they intended to commit grand larceny. (*State* v. *Ryan*, 12 Nev. 401.) Voluntarily going upon the property of another without permission being a trespass, the presumption would naturally follow that the defendants intended to commit such trespass, but an intent to commit a felony, to wit, grand larceny, must be established by other

circumstances in connection with the circumstances of the trespass, and it is not enough that these circumstances are consistent with defendants' guilt and make it possible or even probable that such grand larceny was intended, but they must be such as to overcome the presumption of innocence, and, to be of such character, they must be inconsistent with any reasonable hypothesis of innocence.

A very careful and extended consideration which I have given to an analysis of the evidence in this case upon which the criminal intent of defendants rests raises a serious question in my mind whether, under the rule by which the sufficiency of circumstantial evidence is tested, it would justify the verdict, even though the jury had been fully instructed as to the application of the rule. The only instruction upon the question of the evidence sufficient to establish intent in this case was the following: "The jury is instructed that in the prosecution for an attempt to commit a crime, as in any other case where the intent is material, the intent need not be proved by positive or direct evidence, but may be inferred from the conduct of the parties as shown by the evidence, and the other facts and circumstances in evidence." The defendants in this case were entitled to an instruction to the effect that, in order to justify a conviction, the conduct of the defendants, as shown by the evidence, and the other facts and circumstances in the case, must not only be consistent with the hypothesis that the defendants are guilty, but must also be inconsistent with any reasonable hypothesis that they are innocent, and with every other rational hypothesis except that of guilt. In the absence of an instruction of this kind, a jury might be very apt to fail to apply to the evidence the legal rule in testing its sufficiency, and proceed to convict solely upon the theory that the evidence was consistent with guilt, and that in their judgment the probabilities were that they are guilty, and fail to properly appreciate and apply the other essential requisite of the evidence that it be inconsistent with any reasonable hypothesis of innocence.

In justice to the trial court, and as a matter of practice, it should be noted that counsel for defendants did not request the court for an instruction upon the rule in question. For

this reason, defendants are not in a position to claim. error for the failure to give such an instruction. ( *State* v. *Hing*, 16 Nev. 307.) This court has repeatedly held that, if a party desires explicit instructions to be given upon any point, it is his right and duty to prepare the same and ask the court to give them. ( *State* v. *Smith*, 10 Nev. 106; *Gaudette* v. *Travis*, 11 Nev. 149; *Allison* v. *Hagan*, 12 Nev. 38; *State* v. *Davis*, 14 Nev. 407; *State* v. *St. Clair*, 16 Nev. 207.) While error cannot be predicated upon the failure of the court to give an instruction of the character suggested, nevertheless the absence of an instruction of so great importance in a case resting upon evidence of the character relied on by the state serves to impress upon me in a greater degree, if possible, the seriousness of determining in this case that, as a matter of law, the evidence is sufficient to justify the verdict. Had an instruction of the character mentioned been requested, it would doubtless have been given, and, had it been given, the verdict of the jury might have been very different, and I am impressed that it would have so been. Had such an instruction been refused, it would have amounted to reversible error. I have been unable to satisfy my mind that the evidence in this case justifies the verdict, and my ultimate conclusion is to the contrary.

I appreciate fully the difficulties which usually beset the prosecution in securing convictions in cases of this kind, and that prosecutions frequently fail, although the officers feel convinced of the guilt of the person charged. Yet it must always be borne in mind that the safeguards which the law throws around a person charged with crime are intended for the protection of the innocent. These very safeguards frequently enable the guilty to escape a just punishment, yet without them the danger would be increased of unjust convictions of the innocent. No more salutary rule exists in the criminal law than the one so frequently referred to in this opinion—that, when circumstances alone are relied upon in order to justify a conviction, they must not only be consistent with guilt, but, to overcome the presumption of innocence, they must be inconsistent with every other reasonable hypothesis except that of guilt.

For the reasons given, I am of the opinion the judgments

and orders appealed from should be reversed, and the cause remanded for a new trial, in order that additional evidence, if possible, may be adduced which will remove or tend to remove the uncertainty which I think exists from the evidence which is now disclosed by the record, and such instructions given as will enable the jury to apply to the evidence the proper legal test of its sufficiency.

### ON PETITION FOR REHEARING

Petition for rehearing denied, NORCROSS, C. J., dissenting.