# REPORTS OF CASES

## DETERMINED IN

# THE SUPREME COURT

### OF THE

# STATE OF NEVADA

## JANUARY TERM, 1916

[No. 2206]

## STATE OF NEVADA, RESPONDENT, *v.* C. A. WHITAKER, APPELLANT.

[154 Pac. 927]

1. CRIMINAL LAW—APPEAL AND ERROR—REVIEW—EVIDENCE SUP-PORTING VERDICT.

Judgment in a criminal case will not be reversed for insufficiency of evidence where the verdict is supported by substantial evidence.

2. BURGLARY—CONVICTION—SUFFICIENCY OF EVIDENCE.

In a prosecution for burglary in the first degree, evidence *held* to justify verdict of guilty against a defendant.

3. BURGLARY—BURGLARY IN THE FIRST DEGREE—TIME OF BREAKING —SUFFICIENCY OF EVIDENCE.

In a prosecution for burglary in the first degree, evidence *held* sufficient to justify finding that the mill was broken into in the nighttime, between sunset and sunrise, as defined by Rev. Laws, 6634.

APPEAL from Tenth Judicial District Court, Clark County; *Charles Lee Horsey*, Judge.

C. A. Whitaker was convicted of burglary in the first degree, and from the judgment and an order denying his motion for a new trial, he appeals. **Affirmed.**

*F. R. McNamee* and *Leo A. McNamee*, for Appellant:

There is no evidence connecting the defendant with

the commission of the crime, or that would justify the jury in returning a verdict of burglary in the first degree. The evidence, in the most favorable light for the state, could sustain a verdict of burglary in the second degree only. (*State* v. *Gray,* 23 Nev. 301.) It will not be presumed that the entry was made between sunset and sunrise. The facts from which this may be inferred must be proved, and it must not be left to presumption, conjecture, or inference. (6 Cyc. 231, 242–3; *People* v. *Griffin,* 19 Cal. 578, 16 Cyc. 1051; *U. S.* v. *Ross,* 23 L. Ed. 707.)

Where there is uncertainty as to which one of several persons committed the crime, all must be acquitted. (12 Cyc. 493, note 95; *People* v. *Woody,* 45 Cal. 289.)

The testimony of the defendant was in all respects consistent with innocence, as were also his conduct and actions from the time he was first intercepted until the completion of the trial. "If the evidence as a whole is consistent with the theory of defendant's innocence, the verdict of guilty should be set aside." (12 Cyc. 489.)

To warrant a conviction on circumstantial evidence, each fact necessary to the conclusion must be proved by competent evidence beyond a reasonable doubt. (12 Cyc. 489.) All the circumstances proved must be consistent with each other, consistent with the hypothesis that the accused is guilty, and at the same time inconsistent with the hypothesis of innocence, and with every other rational hypothesis except that of guilt. (12 Cyc. 488.)

If there is no competent evidence to sustain a verdict of conviction, the judgment, on the point being properly presented, will be reversed. (*State* v. *Ah Tom,* 8 Nev. 213; *Territory* v. *Booth,* 36 Pac. 38.) When there is no evidence to establish the charge set forth in the information, a question of law is presented, on which the appellate court will be competent to act. (*People* v. *Smallman,* 55 Cal. 185–191.)

Where there is a clear failure of proof, the propriety of conviction on the evidence before a jury becomes a question of law, within the competence of the appellate

court. (*People* v. *Kuches,* 120 Cal. 566–569; *State* v. *Weber,* 31 Nev. 385; *State* v. *Thompson,* 31 Nev. 209; 12 Cyc. 907.)

*Geo. B. Thatcher,* Attorney-General, and *Edward T. Patrick,* Deputy Attorney-General, for Respondent:

The court is without jurisdiction to hear and determine the appeal, the only assignment of error in the entire record being the order of the court below denying the motion for a new trial upon the ground of the insufficiency of the evidence to sustain the verdict and that the verdict is contrary to law and the evidence. An appeal to the supreme court from the district court can be taken on questions of law alone. (Rev. Laws, 7287; Nev. Const., art 6, sec. 4.)

The verdict in a criminal case will not be reversed where there is any evidence to sustain it. (*State* v. *McGinnis,* 6 Nev. 109; *State* v. *Ah Tom,* 8 Nev. 213; *State* v. *Hoff,* 11 Nev. 17; *State* v. *Raymond,* 11 Nev. 98; *State* v. *Crozier,* 12 Nev. 300; *State* v. *Mills,* 12 Nev. 403; *State* v. *Wong Fun,* 22 Nev. 336; *State* v. *Preston,* 30 Nev. 301; *State* v. *Thompson,* 31 Nev. 209.)

By the Court, COLEMAN, J.:

Appellant and two others were charged jointly in Clark County with the crime of burglary in the first degree. The jury brought in a verdict of guilty as to appellant, and not guilty as to the other defendants. This appeal is taken from an order denying a motion for a new trial and the judgment.

It was charged that the defendants broke into the mill of the Searchlight Mining and Milling Company and stole therefrom nine or ten amalgamating plates. The evidence against defendants was entirely circumstantial, and the only error assigned is that there was no evidence upon which a verdict of guilty could be based; and that even if there was evidence that appellant burglarized the mill, there was a total failure to show that it was done in the nighttime, which is the essential ingredient of burglary in the first degree.

**1.** It has been held by this court in numerous instances that a criminal case will not be reversed for insufficiency of the evidence if there is substantial evidence to support the verdict. (*State* v. *Thompson*, 31 Nev. 217, 101 Pac. 557.) Appellant finds no fault with this rule.

**2.** Witnesses in behalf of the state testified that the plates in question were in the mill on July 13, 1915, but that on the 15th of that month it was discovered that the mill had been broken into and the plates taken out. When it was discovered that the mill had been burglarized, the deputy sheriff at Searchlight, two miles away, was notified, and he at once took steps to apprehend the guilty parties. He called to his assistance a number of men in the vicinity. It was sought to track the persons who had committed the crime. One of the lessees of the mill testified that shortly after the "clean-up," which took place about July 1, he put papers on the plates to protect them. Some of the witnesses testified that they traced fragments of papers and small portions of amalgam from the plates for a distance of about 200 feet from the mill, at which point tracks of horses were discovered, which were trailed to the camp of the defendants. One of the witnesses who did the trailing testified that he had shod the horses, and that a cut-off shoe was put on one foot by him, which enabled him to distinguish the track. It was also testified that in places leading from the mill to where the horses were mounted, and at other points along the trail, there were tracks of two men, one of whom wore shoes with hobnails in them, and that on one shoe the nails were broken from the heel in a particular place, which made the track easy to identify.

This witness also testified that after the defendants had been arrested and taken to Searchlight he observed the track of appellant, and it was the same (with some missing nails) as the one he saw leading from the mill and along the trail of the paper, and which he saw in other places leading to the camp of defendants.

The plates weighed about 450 pounds; and as the horses were small, and defendants' camp twenty-one miles from

the mill, it was the theory of the state that defendants thought it too much of an undertaking to have the horses make the trip from the camp to the mill and back, carrying the plates.

The plates were not found in the possession of any of the defendants, but were found on July 27 about two miles from the mill, rolled up. At the camp of defendants a canvas was found. One witness testified as to the appearance of this canvas:

"Q. What marks, if any, did you find on the canvas? A. A long, narrow mark, taking up about the length of the canvas.

"Q. Resembling what? A. Well something hard enough to make that mark had been resting against it, and also—

"Q. Will you pick out the canvas that you say you saw? A. Yes, sir (Witness examines first piece of canvas). That doesn't show anything extra. (Witness examines second piece of canvas.) That is one of the marks, I guess.

"Q. This mark along here? A. Yes, sir.

"Q. What is the color—what color does that resemble? A. Sediment and mud.

"Q. Off of what? A. It may have been from the plates, and it may have been—where that piece were cut out it was thicker and heavier. It isn't so very heavy along here.

"Q. I call your attention to two holes there where some stuff has been cut out. A. There?

"Q. Yes. A. Yes, sir.

"Q. Who cut it out? A. My partner.

"Q. In your presence? A. No sir; not in my presence.

"Q. Well I thought you knew about its being cut. What about this? (exhibiting piece of canvas to witness). I direct your attention to a spot here, and will ask you if you know what it is? A. Let me see it first (witness examines canvas). That shows very poorly, but it may be some of the sediment.

"Q. I call your attention to some pieces of that canvas

being cut out. What do you know about that? A. I was not present when that was cut out.

"Q. Where were these pieces of canvas when you saw them? A. Laying at the door, beside the old packsaddle.

"Q. At whose door? A. At the cabin door of the camp where these boys were camping.

"Q. What boys? A. Craigs and Whitaker. * * *

"Q. You may state whether you made an examination of the canvas before the pieces were cut out? A. I did. I examined this with a glass.

"Q. A microscope? A. Yes, sir.

"Q. What was the result you found? A. Why you could see the amalgam on this canvas with a glass at that time, but it was loose on the canvas?

"Q. It wasn't ground into the canvas? A. No; not where I could see, it wasn't.

"Q. Did you find amalgam in these pieces that were cut out? A. Well, you couldn't see it.

"Q. I mean with the glass did you find it? A. Well, yes; where those pieces were cut out you could.

"Q. Did you make any other examination of these canvases? A. No; just examined where those marks were on there.

"Q. Did you examine this line? A. Yes, sir.

"Q. What did you find? A. I found amalgam along there, and you could see quicksilver.

"Q. You examined that with a microscope? A. Yes, sir.

"Q. This amalgam that you found there you say was not ground into the canvas? A. No; it was loose at that time; that is, what you could see of it.

"Q. This amalgam that you speak of, was it in the shape of mud on the canvas? A. Yes. There was ground-up sand with it. * * *

"Q. I call your attention to a spot on this canvas that I hold in my hand. What would say this was? A. I would call that sand myself. There might be amalgam in it, but it is sands off plates.

"Q. Calling your attention to this light line, what would you say about that? A. Well, that is a line—it looks like

it might have been wrapped around the plates that were stolen. The sands—the peculiarity about it is the white. It looks like the sands had been pounded up fine.

"Q. Two places in that line you cut out? A. Yes, sir.

"Q. Why? A. Because it had heavy sands and looked like there was little specks of amalgam in it. That is the reason I had it cut out, to have it assayed, to be sure that there had been such a thing as amalgam in it."

The assays showed values of about $8,000 per ton.

The horses which it is claimed the defendants used on the night of the burglary had been in charge of one Booth, by whom they were delivered to a son of one of the defendants on July 13, for the purpose of taking them into California. That night he stayed at the camp of defendants, twenty-one miles away. According to the evidence for the defense, this boy left the camp of defendants on the 14th and arrived in Barnwell, Cal., that night; but according to the evidence of the state, he did not arrive there until the 17th. The evidence for the state is to the effect that the horses were returned from Barnwell, Cal., forty-one miles away, upon telephonic communication, on the 19th, and that they were legweary when they reached Searchlight. The evidence on the part of the state also shows that these identical horses made two trips to the camp of defendants and one from there to the mill, the theory of the state being that one set of tracks was made when the horses were taken to defendant's camp by the boy, and that the tracks leading away were made by the horses while the defendants were using them to go to the mill to burglarize it, and the others on their return to the camp.

Each of the defendants, and a brother of the two defendants who were acquitted, testified that they were at work at their property all of the time from the 12th to the 17th of July, on which last-mentioned day the arrests were made.

It is upon these circumstances that appellant was convicted. Can we say that there was no evidence to justify the verdict? It may be that had we heard the testimony

we would have acquitted appellant, but we cannot say that the jury was not justified in finding him guilty. It is claimed that the testimony was the same against all of the defendants, and that if the jury did not think all of the defendants guilty they should have acquitted appellant. We do not think this contention sound. The evidence showed that there were only two men tracked from the mill. The tracks of one indicated that they were made with hobnail shoes. Evidence was offered to the effect that appellant wore hobnail shoes, while the jury could not tell which of the other two defendants was the person tracked from the mill, and consequently acquitted both. If the jury believed the testimony of the witness as to the tracks made by a hobnail shoe leading from the mill being identical with those made by appellant at Searchlight, and also the theory of the state that the amalgam on the canvas was due to the fact that some of the plates were rolled in it, we think the jury was justified in its finding.

**3.** The only evidence tending to show that the mill was burglarized in the nighttime is to the effect that candle grease was found in the mill:

"Q. Now, Mr. Lund, I would like you to tell me and tell this jury if those plates were on those tables the day you were in there just before the robbery? A. Yes, sir.

"Q. They were in place and on the table? A. They were.

"Q. Well, how can you say, then, that this candle grease wasn't on those tables then, when they were covered by the plates? A. You can tell candle grease when it is newly spilled any time.

"Q. The plates were on top of the candle grease, weren't they? You may be able to do that, but you don't understand my question. You say the candle grease was not on those tables the day before? A. It was not; no.

"Q. Now, if those tables were covered up by the plates, how could you possibly tell? A. No; but that candle grease would have to be flattened out with those heavy plates on it, and this was a thick grease, standing up this high (indicating).

"Q. Those plates weigh 400 or 500 pounds? A. They do.

"Q. And if they set down on those tables how can you tell that candle grease wasn't there? A. Because the weight of those plates would have flattened that candle grease out, and this was not flattened out at all.

"Q. Yes; that is true enough, but the day before you couldn't say there was no candle grease there? A. No; I couldn't see through the plates.

"Q. Then if it was covered up by the plates you couldn't have told, so you don't know whether it was there the day before or not; isn't that a fact. A. I know this was newly spilled candle grease. It showed plain evidence of it. * * *

"Q. You say you had no candles in the mill? A. Yes, sir.

"Q. You have used candles in the mill, haven't you? A. I never, from the time we started, remember the time when we used candles there."

This is all of the testimony in the record to sustain the finding that the mill was burglarized in the nighttime. What, if any, inference should be drawn from the finding of candle grease in the mill? So far as appears, there were no electric lights in the mill, and we cannot indulge the presumption that there were, particularly since that locality is sparsely settled. The mill was operated only periodically, and was probably run only in the daytime. It is a well-known fact that candles are used to provide light, and it will be inferred that the candle grease found in the mill as was testified to was caused by a lighted candle. A lighted candle is used for only one purpose, and that is to enable one to see; and since nighttime is from sunset to sunrise (Rev. Laws, 6634), and since in the middle of July there is in Nevada a long space of time both after sunset and before sunrise which is light, we cannot say that the jury was not justified in inferring that the mill was burglarized in the nighttime. As was said in State v. Druxman (Wash.) 153 Pac. 382:

"The choice between contrary inferences from evidence, like the credibility of conflicting evidence, is always for the jury."

In State v. Watkins, 11 Nev. 30, it was shown that

certain articles, which were in a room at 9 o'clock at night, were missing in the morning; that it was impossible for any one to have taken them without entering the room, and they were found in defendant's possession between 12 and 1 o'clock the same night. To the objection that the evidence did not establish the burglary, the court said:

"It was necessary to show that the entry was effected in the nighttime, and proof that defendant had in his possession, outside of the house, between 12 and 1 o'clock, goods which were in the house at 9 o'clock, and which only could have been obtained by entering the house, was proof of an entry in the nighttime."

We cannot say that, in drawing the inference that the mill was burglarized in the nighttime, the jury abused its prerogative.

The judgment is affirmed.