[No. 2071]

## STATE OF NEVADA, RESPONDENT, v. GEORGE FRONHOFER, APPELLANT.

[150 Pac. 846]

1. CRIMINAL LAW—ACTS OF CONSPIRATORS—PRELIMINARY EVIDENCE.
   In a prosecution for murder, evidence *held* insufficient to establish *prima facie* a conspiracy between defendant and others so as to render admissible evidence of the acts of such others.

2. CRIMINAL LAW—ACTS OF CONSPIRATORS—PRELIMINARY EVIDENCE.
   A conspiracy may be established by circumstantial evidence, but the circumstances must be such that there can be no other reasonable hypothesis but that of guilt.

3. HOMICIDE—EVIDENCE—PROSECUTION—SUFFICIENCY.
   Deceased was shot by a man nearly 200 feet away, and the witness who was with him jumped and ran to cover. The only evidence that accused was the guilty person was an identification by the witness of a hat which the murderer was wearing. *Held*, that such evidence was insufficient to support a conviction.

4. CRIMINAL LAW—TRIAL—ARGUMENT OF COUNSEL—INSTRUCTIONS.
   In his opening statement the prosecutor charged as a fact that deceased made a dying declaration in which he identified accused as his assailant. The declaration was excluded, and the court charged the jury that they should not attempt to consider evidence rejected as inadmissible. *Held*, that the error in the statement was not cured by the instruction.

5. CRIMINAL LAW—EVIDENCE—ADMISSIBILITY.
   In a prosecution for murder, deceased's companion could not relate a conversation with deceased shortly before the killing, wherein he assumed that accused had made an earlier attack.

6. CRIMINAL LAW—APPEAL—REVERSAL.
   Where a crime was plainly committed, and on another trial evidence showing accused's guilt might be introduced, accused will not on reversal for insufficiency of the evidence be discharged.

APPEAL from Sixth Judicial District Court, Humboldt County; *Edward A. Ducker*, Judge.

George Fronhofer was convicted of murder in the first degree, and he appeals. **Reversed and remanded.**

*B. F. Curler* and *Salter & Robins*, for Appellant:

A foundation sufficient to establish *prima facie* a conspiracy must be laid before the acts and declarations of alleged coconspirators can be admitted in evidence, and such acts and declarations must be those only

which were done and made in furtherance of the alleged conspiracy. (Greenleaf, Ev. 16th ed. vol. 1, sec. 184; *Metcalf* v. *Connor*, 12 Am. Dec. 340; *Osmun* v. *Winters*, 46 Pac. 780; *Holden* v. *State*, 18 Tex. App. 106; *Kelley* v. *People*, 55 N. Y. 565; *Brown* v. *U. S.*, 37 L. Ed. 1010; *State* v. *Tice*, 48 Pac. 357; *State* v. *Moore*, 48 Pac. 468; *State* v. *Ah Tom*, 8 Nev. 213; *State* v. *Soule*, 14 Nev. 453; *State* v. *McLane*, 15 Nev. 361.)

Before the acts and declarations of an alleged conspirator are admissible, the fact that a conspiracy existed must be shown *aliunde*. (Am. & Eng. Ency. Law, vol. 6, p. 868, and cases under note 2.)

Testimony must be confined to the acts and declarations of the alleged coconspirators during the pendency of the alleged criminal enterprise. (*Brown* v. *U. S.*, 37 L. Ed. 1010; *Logan* v. *U. S.*, 144 U. S. 263, 36 L. Ed. 429.)

The conduct of the attorneys for the state, particularly in the opening statement, prejudiced the jury against the defendant and deprived him of a fair trial. (*State* v. *Scott*, 37 Nev. 412; *People* v. *Montague*, 71 Mich. 447, 39 N. W. 585; *Scott* v. *State*, 110 Ala. 48, 20 South. 468; *Heller* v. *People*, 22 Colo. 11, 43 Pac. 124; *State* v. *Gutekunst*, 24 Kan. 252; *Berry* v. *State*, 10 Ga. 751; *Martin* v. *State*, 63 Miss. 505.)

*Geo. B. Thatcher*, Attorney-General, for Respondent:

Acts and declarations of one coconspirator, not made in the presence of the defendant, are admissible to show motive for a conspiracy. (6th Dec. Dig., sec. 422, subd. 4.) Evidence is admissible if it leads to the conclusion that a conspiracy in fact existed. (*State* v. *Ryan*, 82 Pac. 703, 705; *People* v. *Bentley*, 17 Pac. 436; *People* v. *Childs*, 59 Pac. 768.) There was sufficient evidence to establish the alleged conspiracy. (*People* v. *Ferenbach*, 36 Pac. 678; *State* v. *Vertrees*, 34 Nev. 509; Wharton, Ev. sec. 1205; *Star* v. *State*, 115 Pa. 364; *People* v. *Childs*, 127 Cal. 363, 59 Pac. 768; *Spyes* v. *People*, 122 Ill. 1; *State* v. *Cassedy*, 115 Pac. 287, 294; 12 Cyc. 438; *State* v. *Ward*, 19 Nev. 297; *Muller* v. *Dayton*, 10 N. W. 816; *State* v. *Dilley*, 87 Pac. 133, 136.)

By the Court, NORCROSS, C. J.:

George Fronhofer was convicted of murder in the first degree in the Sixth Judicial District Court in and for Humboldt County. From the judgment and from an order denying a motion for a new trial, he appeals.

Peter Laux was shot on the 23d day of January, 1912, near the mining camp of Kennedy, in Humboldt County, and on the 13th day of February following he died from the effects of his wounds. It was the theory of the state that the shooting was in pursuance of a conspiracy upon the part of the defendant and certain other residents of Kennedy. The only eye-witness to the shooting, other than the participants, was one B. H. Labigan. The witness Labigan testified that on the day of the shooting the deceased and himself had gone out from the town of Kennedy to work upon their mining locations. They arrived at the place where they intended to work about 10:30 a. m., and worked there until after 1 o'clock. While at work they heard the report of two shots. The witness said to the deceased: "Pete, they don't intend to let us work here; what is the use of getting hurt for all the mines in the country? Let us go down." The deceased replied: "All right; I will blow out these two holes anyhow, and then we will go down." After the blasts were set off Labigan and the deceased walked to the top of the ridge where their lunch and a shotgun carried by Labigan had been left. The deceased took some of the lunch and sat down to eat it. Labigan was stooping to sit down with his back towards the deceased when a shot rang out close to them.

The sound appeared to come from the eastward and back of Labigan. The deceased stood up and said, "What is that?" Labigan immediately turned around, heard the report of a second shot, and, just as he looked to where the shots seemed to come from, Laux fell forward on his left side and face. Labigan looked at him for an instant, and then jumped behind a tree where he had placed the lunch-bag, containing shells, and his gun. He picked up the bag in one hand and the gun in the

other, and, noticing a cliff of rocks near him, jumped behind the rocks. As he jumped from the tree to the cliff of rocks, he looked up towards another cliff of rocks, 162 feet from the place where Laux was shot, and saw a man behind the rocks. Quoting from the witness's direct examination, relative to his observations at this point, the following appears:

"As I jumped from the tree across to the rocks I looked up and I saw the man that I supposed done the shooting. I saw him from about here (indicating his breast), and he was dodging down kind of to the leftward, and down like that; that was the position of it as I saw him as he was going across, and I saw that he had on a black hat; was not very regular, the crown did not stay up, and it had a peculiar look; that hat particularly was impressed on my mind, and I thought the man looked like Jake Leick; he had much the same features, and Jake Leick was the man I thought did the shooting.   *   *   *"

After crouching for a few seconds behind the cliff of rocks where he had taken shelter, Labigan started to run towards the southeastwards, keeping the cliff of rocks behind which he had taken shelter between him and the cliff of rocks behind which he had seen the man assumed to be the person who did the shooting. The witness testified that he determined to go to a farmhouse some miles away, fearing to go immediately to the town of Kennedy; that he thereafter became lost in the hills, but subsequently reached the ranch of John Guthrie, about four hours after the shooting. Immediately upon his arrival at the Guthrie ranch, he said: "Pete has been shot in a cowardly manner, and I think it is Jake Leick that did it."

Asked to describe the man he saw behind the cliff of rocks, he said: "The man appeared to me to look like Jake Leick, German features, kind of sandy, a light mustache, and a black hat."

Relative to a hat introduced in evidence, which was shown to have been a hat belonging to Jake Leick, but worn on the day of the shooting by the defendant, the

following appears from the direct examination of the witness Labigan:

"Q. I will show you this object and ask you, Mr. Labigan, if you have ever seen it before? A. That——

"Q. Just answer the question 'Yes' or 'No.' A. Yes, sir.

"Q. Now, when and where? A. I saw that at the time I jumped across from the tree that No. '1' to No. '3.'

"Q. Where did you see it at that time? A. When I looked up here at the man that stood there.

"Q. Well, now what man was it that stood there? A. The man who did the shooting, I believe, that I saw that day at that time.

"Q. About how far was it do you say up to where the man stood; state your best information? A. About 150 feet.

"Q. And that is the hat you say you saw him have on? A. Yes, sir.

"Q. When did you next see that hat after seeing it that day? A. I believe at the preliminary; yes, it was at the preliminary in Judge Dunn's court.

"Q. As you were looking up at this man that fired the shots, was there anything peculiar about the hat that directed your attention to it? A. Yes, sir.

"Q. What, if anything? A. Well, the top was not sticking out like that; it was not a round top; it is in my mind; I will not make no mistake in it; it was not a round top like that; this top was all built down, and the rim was sagged like in places, and it appeared not to be even, but uneven, in its looks.

"Q. Which appeared to be uneven—the whole hat rim? A. The whole hat; it was not with the rim straight out like that; the rim did not stick out like that, or, like many a hat (indicating), the rim was not turned up all around, but some parts of that brim appeared to be sagging, and this top was not sticking out; it was square, and it looked like as though it was cut off more on the top. It had the peculiar look. *  *  *"

Relative to the impression gained by the witness of

the man seen by him in the cliff of rocks, the following appears in his testimony:

"Q. When did you first change this impression that you had that Jake Leick was the man up in the rocks? A. I began to think in Guthrie's house when I got calmer, and concluded I could not swear positively that Jake was the man because I had not seen him plain enough."

The witness John F. Guthrie, to whose ranch the witness Labigan went immediately after the shooting, testified that when Labigan first arrived he said: "Jake Leick has killed Peter Laux." Later, after supper, the witness asked Labigan if he was sure it was Jake Leick and he (Labigan) "said he would not swear it was Jake Leick, but he could almost swear to it, although the hat was almost like the hat that Jake Leick wore."

During the night of January 23, following the shooting, Peter Laux was found near the spot where he fell, as testified to by the witness Labigan, by a posse made up of parties from the Guthrie ranch and from Kennedy. When found he was partially conscious. He had moved several feet from the place where he fell when shot. When found, lying loosely upon his breast, a little to one side, was a pistol belonging to Labigan with every chamber loaded.

Charles W. Muller, deputy sheriff of Humboldt County, and a witness for the state, testified in reference to the hat referred to in the testimony of Labigan as follows:

"Q. Did you say anything to the defendant as to what kind of a hat he wore on the day of the shooting? A. Yes, sir.

"Q. What did you say to him? A. I asked him if he was wearing the same hat yesterday that he was wearing at that time.

"Q. What kind of a hat was that? A. He was wearing a white hat.

"Q. What did he say? A. He said he was wearing an old black hat of Jake's yesterday:

"Q. Did you ask him to find the hat for you? A. Yes, sir.

"Q. And what was the result? A. I went up to the house with him to Jake's house, and we searched the house thoroughly for the hat, and could not find it anywhere. He said he did not know just what became of it; that he left it there in the house that night when he came down from work. I told him to continue to look for the hat; that I would like to get it and bring it in. He said that he would. The next morning when I came he told me he had found the hat, and I went up to the house with him to get it, and got it."

The foregoing is the gist of the testimony against the defendant otherwise than that offered in support of the alleged conspiracy.

[1–2] The court required the district attorney to make a statement in the absence of the jury of what he expected to prove to establish *prima facie* a conspiracy upon the part of defendant and others. The overruling of an objection to the proposed evidence is one of the principal errors assigned.

The offer was substantially to show the following facts: That the Gold Note Mining and Milling Company was a corporation theretofore owning certain mining claims near Kennedy; that one Klopstock was president of the company, and A. E. Lasher its secretary; that these men were promoting the company and had had Peter Laux employed upon the property until about January 1, 1912; that at that time the company was indebted to him and that, by reason of that fact and the further fact that the company had not done its assessment work for the year 1912, Laux and Labigan put up a relocation notice on some of the company's mining property; that Lasher had a conversation with Labigan to the effect that, while he was connected with Klopstock financially in the promotion of the property, he was at liberty to withdraw from it and go into it with Laux; that conversations occurred between Labigan and Klopstock in which Klopstock exhibited a very hostile manner towards Labigan and

Laux; that a quarrel ensued in which hot words passed between Klopstock and Labigan; that a notice was found on the ground located by Labigan and Laux signed by Klopstock, and reading as follows:

"Paul Klopstock, President and Manager.

"Henry Bredhoff, Vice-President.

"H. W. Mathews, Secretary.

"A. E. Lasher, Treasurer.

"Executive Office of the Gold Note Mining & Milling Company.

"Mines and Mill at Kennedy, Nev.

"Kennedy, Nev., January 2, 191—.

"To Peter Laux, Albert Kattenhorn, B. H. Labigan, and All Others to Whom This May Concern:

"You and each of you are hereby notified to keep off from the Gold Note group of mines, or any of the claims belonging to said group. You are also hereby notified that any trespassing on said property will be dealt with in accordance with law.

"The undersigned is the owner and operator of said Gold Note group of mines, in the Kennedy Mining District, Humboldt County, State of Nevada.

"Gold Note Mining & Milling Company,

"By Paul Klopstock, President."

That the defendant was employed by the Gold Note Mining Company as watchman upon the property, and while so employed occupied a cabin upon the property; that about two weeks prior to the shooting of Laux, Laux and Labigan were working upon the property located by them, when they heard two shots; that after hearing the shots Laux and Labigan went down to the cabin of defendant and asked defendant if he had heard the shots, to which defendant replied "No," and then stated that he did not have a gun; that the next day Laux and Labigan went over to defendant's cabin, and Laux accused defendant of being hired there to keep him off the ground; that defendant in reply stated that he was there as a watchman, and that he was going to

stay there; that considerable other words passed back
and forth, and they finally quit, and the argument
subsided; that neither Lasher, Leick, nor the defendant
went to see Laux after the shooting, nor offered any
assistance in caring for him in the little town of
Kennedy, which did not at that time contain more than
a dozen people; that on the evening of the shooting Mrs.
Laux came to the door of Mr. Lasher's cabin and asked
Lasher to go up on the hill and assist her in finding her
husband; that at that time Lasher said her husband
would be down in a short time; that he had heard
Labigan and Laux talking about working nights; that
Labigan and Laux had had no such conversation; that
when Mrs. Laux came to the door, Lasher sent his boy
out the back door with a rifle; that Lasher was at first
afraid to step out the door when requested so to do by
Mrs. Laux, and evaded her request to go up on the hill
and look for her husband, and sent her home; that Jake
Leick and the defendant were requested in the same
way by Mrs. Laux on the evening after the shooting to
go up on the hill and help her look for her husband, and
they spoke something about his working nights when
there was nothing of the sort ever contemplated so far
as the witness Labigan or Mrs. Laux knew; that they
evaded her, did not offer her any assistance to go look
for Mr. Laux on the hill; that on that evening the
defendant was staying at Jake Leick's place; that he
was lame; that he received or claimed to have received
a wound that day; that on the same evening Marvin
Kennedy went to Jake Leick's place and requested Leick
and defendant to go and assist; that Mrs. Laux was
looking for her husband; that defendant went down to
see Mr. Lasher; that the officers of the Gold Note Mining
Company lived at Mr. Lasher's house.

There was some testimony offered in support of most of
the offer of proof made by the district attorney, but some
of the evidence in support of the offer is worthy of brief
comment. Relative to the testimony of Labigan, to the
effect that "he and the deceased heard two shots fired

about two weeks before," there is nothing in the testimony warranting an inference that these shots were fired at the deceased and the witness, or for the purpose of frightening them. True, the testimony is that after hearing the shots they quit work, and went to defendant's cabin and asked defendant who fired the shots, and defendant said: "I don't know; I ain't got no gun."

Upon this visit to defendant's cabin the witness showed defendant some sort of a written notice not to interfere with witness and deceased, to which defendant replied: "I don't know anything about that; I won't get off this ground until I receive an order from the court." Reference was made by Labigan to a mining engineer who had visited the property, and the defendant replied that the engineer had said: "Let the boys come up on the ground as long as they don't go in the mines."

The next day the witness Labigan and the deceased called at defendant's cabin. Defendant invited them to dinner. Labigan accepted. Deceased sat down, but did not eat. Witness Labigan testified to the conversation which ensued as follows:

" 'Pete,' he says, 'what are you up here for?' And Fronhofer replied, 'I am living up here.' And he says, Pete says, 'As long as you are up here,' he says, 'you are keeping that company from paying me my money'; and he says, 'You ain't got no business up here'; he says, 'there ain't nobody in Kennedy would come up here but you'; and Fronhofer, he replied, 'I don't give a damn,' he says, 'I am here, and I am going to stay here.' And Pete replied, he said, 'Well, of course,' he says, 'you don't give a damn,' he says, 'for me and my family,' he says: 'That this company owes me $100,' and he says, 'You will stay here and keep me out of it for your lousy wages.' And they were getting quite angry, and Fronhofer replied, and he says, 'I am here, and I don't give a damn for you or nobody else, and I am going to stay here, and I would like to see somebody put me off.' And they were getting pretty angry, and I stepped in between and said, 'Oh, well, Pete,' says I, 'what is the difference if the man is

here? Let him stay here; as long as we can go ahead without interference and work without interference, it is all right. Come ahead; let us go down to the cabin.'"

Relative to the circumstances that neither Lasher, Leick, nor the defendant, went to see Laux after the shooting, it appears from the testimony that a number of other residents of Kennedy, not alleged to be in the conspiracy, did not go to see Laux. It does appear, however, that Mrs. Lasher did go to the house of Laux, and was with Mrs. Laux the morning her husband was removed to Winnemucca.

Relative to the fact that neither the defendant nor Jake Leick volunteered to go with Mrs. Laux to look for her husband, when she called at Leick's house early in the evening of the day of the killing and appeared anxious about her husband, the following appears in the testimony of Marvin Kennedy, who also called at Leick's house relative to the same matter:

"I said that some of us had better go and see what had happened. They said they probably had gone up to work at night so they could get their work done. * * * They said I had better go up with her if she was going up; that Pete was not sore at me or anything."

Further upon the same subject we quote from the testimony of this witness the following:

"Q. When you went up to Leick's and asked Leick or some of those persons sitting there something about going up on the hill, did you not know at that time that Leick and Laux had had trouble and were deadly enemies? A. Yes, sir.

"Q. And did you not know the same thing with reference to Stone and Laux? A. Yes, sir.

"Q. And did you not know the same thing with reference to Miller and Laux? A. Yes, sir.

"Q. And in spite of that you went up and asked those persons to go up? A. Yes, sir; they were the only persons in town that could go."

Mrs. Ella Laux, widow of the deceased, testified for the state that she knew there was ill feeling between

Mr. Laux and Mr. Klopstock, and Mr. Lasher, growing out of the location made by Laux and Labigan; that there was very hard feeling between Laux and Leick, which was not due to the location on the Gold Note property; that in the evening of the day of the shooting she called at Leick's house and said to Leick:

" 'Mr. Leick, have you seen anything of Peter?' and he says, 'No; Charlie George said he saw Mr. Labigan going down the hill.' At the same time Mr. Fronhofer * * * said, 'I saw Mr. Labigan going down the hill.' "

The following question and answer appear in the testimony of this witness:

"Q. Did you observe anything peculiar as to the appearance of Mr. Leick—Jake Leick? A. Yes, sir; he did not look natural to me, and he did not look like he always looked. He looked awful pale, and the other man, too; nary one seemed right, and they did not act right to me."

Relative to a conversation had the same evening with Mr. Lasher, the witness testified that Lasher said: "Well, I heard they were going to work nights." She further testified that she said to Mr. Lasher, "I am going up to the mine and hunt them, and I would like for you to come along," and that Lasher made no reply, but turned and walked into the house and shut the door.

Some other circumstances offered as evidence of a conspiracy, which counsel for the state has considered of sufficient importance to refer to in the brief, are, quoting from the brief, the following:

"Klopstock was not present on the 23d, * * * he having gone on the stage a day or so before, but the night before he left he was seen in conversation with Jake Leick in front of the latter's cabin."

"Leick had a claim near the Gold Note property, and on the day of the shooting he went over there and did about two hours' work, which was the first work he had done there for several months."

"As they [the posse coming from the ranch going to look for Peter Laux] passed the place where Jake Leick

lived, their horses were making considerable noise on the frozen ground, and the lights went out in Jake Leick's house. (This was about 9:30 in the evening.)"

"On the day after the shooting, Deputy Sheriff Muller * * * talked with A. B. Lasher, who appeared to be nervous. Lasher sought to get Mr. Muller's opinion, and asked him if he did not think Laux and Labigan quarreled, and that Labigan did the shooting."

"Mr. Muller testified that right after the defendant made his statement at the Kennedy postoffice on the second day after the shooting he (Mr. Muller) went directly down to Mr. Lasher's place for Mr. Lasher to come up, and he found the defendant and Mr. Lasher talking outside the house and on the east side thereof."

From the various circumstances detailed, and possibly some others of a minor character, not necessary to refer to, we are asked to hold that there was sufficient proof to establish the alleged conspiracy.

Assuming, without deciding, that the testimony relative to circumstances following the shooting was admissible, providing there had been some other testimony from which a conspiracy might have been inferred, nevertheless there is not a single circumstance detailed that is not consistent with the innocence of the defendant, and all the circumstances combined are not sufficient to support any probable hypothesis of guilt consistent, beyond a reasonable doubt, with the facts of the case. That a conspiracy may be established by circumstantial evidence may be conceded (Wharton's Criminal Evidence, 10th ed. sec. 888), but, where circumstances alone are relied upon, "if there be no probable hypothesis of guilt consistent, beyond a reasonable doubt, with the facts of the case, the defendant must be acquitted." (Wharton, *supra,* sec. 10.)

The author cites, in support of the text, *Beavers* v. *State,* 58 Ind. 530, 537, in which the court, considering the particular circumstances of that case, says:

"We can conceive of no hypothesis, by which, in the

order of natural causes and effects, the facts proved can be explained consistently with the innocence of the prisoner; and this is the true test of circumstantial evidence. It excludes all reasonable doubt of the prisoner's guilt."

See, also, *Ex Parte Jefferies*, 41 L. R. A. n. s. (Okl. Crim. Rep.) 749, and note, 124 Pac. 924; *Black* v. *State*, 112 Ga. 29, 37 S. E. 108.

This court, in *State* v. *Mandich*, 24 Nev. 336, 343, by Bonnifield, J., said:

"If the circumstances, all taken together, exclude to a moral certainty every hypothesis but the single one of guilt, and establish that one beyond a reasonable doubt, they are sufficient."

See, also, *State* v. *Thompson*, 31 Nev. 209, 220.

The evidence in support of the alleged conspiracy and that against appellant otherwise is entirely circumstantial. It is the contention of counsel for appellant that the court erred in overruling defendant's objection to the offer of proof in support of a conspiracy, and in denying, upon the conclusion of the state's case, a motion to strike the testimony introduced to establish such alleged conspiracy. It is contended that there is no sufficient evidence to support the alleged conspiracy, or otherwise to support the conviction.

Let us consider briefly the circumstances upon which the alleged conspiracy rests. It appears that about a year or more prior to the killing the Gold Note Mining Company, a corporation, acquired certain mining locations at Kennedy. Klopstock was president and Lasher secretary or treasurer of this company. Prior to January 1, 1912, the deceased had been employed as a miner and the company was indebted to him in the sum of about $100. On the 1st of January, 1912, the deceased and Labigan located or attempted to relocate a portion of the mining ground held by the Gold Note Mining Company. This caused ill feeling between the officers of the corporation, particularly Klopstock and the deceased and Labigan.

Klopstock had warned the deceased and Labigan not to interfere with the property, and had placed upon the property a written notice to the effect that if they trespassed upon the property they would be "dealt with in accordance with the law." Klopstock and the deceased had had at least two serious quarrels over the indebtedness of the company to the deceased for the latter's work on the property. No other circumstance connects Klopstock with the alleged conspiracy except the trifling circumstance that the night before he left Kennedy he was seen in conversation with Jake Leick in front of the latter's cabin. Lasher's connection with the conspiracy, in addition to the fact that he was an officer of the Gold Note Mining Company, appears to rest upon the fact that he was seen going to the mining property the morning of the day of the shooting; that his son owned a 22-caliber rifle and went out the back door of the house with it when Mrs. Laux called at his house about 6:30 o'clock of the evening of the day of the shooting; that he stated that he had heard that the deceased and Labigan were going to work nights; that he did not volunteer to go with Mrs. Laux to look for her husband; that he did not call at Laux's house to inquire about the condition of Laux after he was brought to Kennedy; that he seemed nervous when he was talking to the sheriff and inquired of the latter "if he did not think Laux and Labigan quarreled, and if he did not think Labigan did the shooting."

Lasher and Klopstock appeared to be the only two parties residing in Kennedy interested in the Gold Note Mining Company, and who could possibly have been affected by the deceased's location of the mining property.

Jake Leick, who is one of the alleged conspirators, is not shown to have been in any way connected with the Gold Note Mining Company, or that he had discussed with the officers of that company the act of deceased in relocating a portion of its property. It does appear that Leick had a location of his own in the vicinity of the Gold Note property upon which he did a few hours' work upon

the day of the killing, the first that he had done for some time; that he was, to quote from one of the witnesses, a "deadly enemy of deceased," which enmity, according to the testimony of Mrs. Laux, was not due to anything growing out of the deceased's location of a part of the Gold Note property. If there was anything in the evidence to connect Leick with the murder of Laux, his personal enmity to Laux might be considered for the purpose of establishing a motive for the crime, but we think it is not evidence sufficient, standing alone as it does, to connect Leick with a possible conspiracy upon the part of Klopstock, Lasher, or the defendant, nor is it a circumstance tending to establish a conspiracy upon their part. The evidence also shows that Stone and Miller were enemies of Laux, but they are not charged with being conspirators.

The defendant does not appear to have been a stockholder of the Gold Note Company, or interested in its affairs in any way other than as an employee of the company in the capacity of watchman. It appears that about two weeks before the killing some words were passed between the defendant and the deceased at defendant's cabin, but these were not sufficient to establish the existence of any serious enmity between the defendant and the deceased. It appears that at this same conversation the defendant informed deceased and Labigan that he had been advised by some mining engineer not to interfere with deceased and Labigan "as long as they did not go in the mines."

Counsel for the state refers to the remark made by the defendant at Jake Leick's house on the evening when Mrs. Laux called to inquire about her husband, to wit: "I saw Mr. Labigan going down the hill," and contends that it was impossible for the defendant to have seen Labigan going down the hill unless he was at or near the cliff of rocks from which it was claimed the shots were fired. We are unable to find anything in the testimony that will support this assumption. It appears that at the same conversation Mr. Leick also stated, "Charlie George

said he saw Mr. Labigan going down the hill." Charlie George was not called as a witness in the case, but it appears that he was in Kennedy on the evening of the shooting, and that Mrs. Laux had a conversation with him. There is nothing to show that Charlie George did not see Labigan going down the hill, and no greater inference could be drawn from the defendant's statement that he had seen him than from the same statement made by Charlie George. It is not contended that George was a conspirator or unfriendly to the deceased. Besides, it does not appear what hill was referred to or what time of the day Labigan was seen.

We deem it unnecessary to comment upon all of the circumstances offered in support of the alleged conspiracy. Suffice it to say that we think the evidence insufficient, and that it was error for the court below not to sustain defendant's motion to strike. The case would have to be reversed upon this ground alone, but we think it proper to refer briefly to certain other circumstances testified to which are independent of the question of conspiracy.

[3-4] Assuming that the circumstance that the witness Labigan saw a man in the cliff of rocks near the place where the shooting occurred is sufficient to establish that the man so seen fired the fatal shots, proof that the defendant was that man rests upon the circumstance that on the day of the shooting the defendant was wearing a black hat belonging to Jake Leick, and that the witness Labigan, while jumping a distance of eight feet, and glancing for a second or a fraction of a second in the direction of the man assumed to have done the shooting, 162 feet distant, was able to identify the hat worn by the defendant as the hat seen upon the man in the cleft of the adjacent rocks. The hat in question does not appear to have been one of an unusual pattern. We think the ability of a witness to be able positively to identify such an article of apparel, under the circumstances detailed in the testimony, is manifestly improbable. Such identification alone should not be considered of sufficient weight to warrant a conviction. There is no testimony in the

case of the finding of any tracks about the cliff of rocks where the person was alleged to have been seen, or tracks leading therefrom. There is some testimony regarding tracks, but it is impossible to connect them as going from or leading to the cliff in question.

We have read very carefully the nearly 700 pages of testimony without being impressed that the evidence points with any considerable degree of probability to the defendant as the guilty party.

There is some testimony given by the doctor who attended Laux after the shooting and by the latter's widow indicating that after the shooting some one had stamped on Laux's face and hands with the heel or sole of a boot or shoe. This evidence only adds to the general uncertainty of the case.

Counsel for the appellant contends that the conviction in this case can only be accounted for by reason of alleged misconduct upon the part of the district attorney in making his opening statement, wherein he stated as a fact that deceased made a dying statement in which he identified the defendant as the person who did the shooting. Upon the trial the court sustained an objection to the proposed offer of a dying declaration. No objection was interposed at the time the district attorney made his opening statement, nor at any other time, nor was any special instruction asked by the defense that the jury disregard such statement. The jury was, however, instructed relative to rejected evidence generally:

"If the court decide that the alleged evidence is inadmissible, then the jury must not attempt to consider such evidence so decided to be inadmissible and so rejected."

Statements may be made by the prosecuting attorney of such an objectionable character that an instruction to disregard will not be held to cure the prejudicial effect thereof. At the time the district attorney made the statement in question there is nothing to indicate that he was attempting to take any undue advantage of the defendant. Dying declarations are, however, so frequently objected to by counsel for the defense that

prosecuting attorneys should be careful in making positive statements that a dying declaration of a certain state of facts was made. He may state what he expects to prove without encroaching upon defendant's rights or taking chances upon committing reversible error. As this question is not liable to arise upon a new trial and as the case must be reversed upon other grounds, we need not determine whether in this case the statement should be regarded as prejudicial error.

[5] There was some testimony introduced without objection which we think should not be permitted upon a new trial. We refer to the testimony of the witness Labigan purporting to detail a conversation with the deceased at the time of hearing two shots fired shortly before the killing, in which he assumes, in effect, in his remarks to deceased, that the shots were fired by persons connected with the Gold Note Mining Company.

[6] If this court were confident that no other evidence could be introduced upon another trial than that held to be admissible upon the present record, we should order the defendant discharged. As it clearly appears, however, that murder was committed by some one, and other evidence may exist tending clearly to establish the identity of the murderer, the case will be remanded for a new trial.

Judgment reversed, and cause remanded for a new trial.