JAMES WILLIAMS, APPELLANT, *v.*
THE STATE OF NEVADA, RESPONDENT.

No. 4457

June 25, 1962                              372 P.2d 462

[Rehearing denied July 20, 1962]

*Springmeyer, Thompson & Dixon,* of Reno, for Appellant.

*Roger D. Foley,* Attorney General, *George G. Holden,* District Attorney of Lander County, for Respondent.

## O P I N I O N

By the Court, BADT, C. J.:

Williams was convicted of the grand larceny of 14 head of sheep and has appealed from the judgment of conviction.

The main point raised in the appeal is whether it was error to admit the testimony of August L. Rowher, referred to as Monte Rowher, either as an expert or as one qualified by the sufficiency of his observation to identify the 14 head of sheep, subsequently proved to be the sheep of Ellison Ranching Company, as the same sheep he had seen in the possession of Williams's employee, Cecil Decker. Rowher had been employed as district range manager for the Bureau of Land Management since October, 1951, a period of 10 years, and had been employed by the Bureau since 1937, except for a period of military service. He had observed the sheep on the morning of May 2, 1961, in the custody of Cecil Decker, who identified himself as working for Williams. He spoke to Decker and looked the sheep over, counted them twice, and observed that they were a bunch of yearlings, with one black-face yearling, and having a red mark on the back. The mark was undecipherable. He did not know how many of them were yearling ewes and how many were yearling wethers. Decker said that the sheep were Jimmy Williams's, and that he, Decker, was taking them down the canyon to what was known as the Snow Cat cabin. Rowher knew that Williams had a horse and cattle permit on the public domain, but no sheep

permit. The Fish Creek Range, where the sheep were observed, was winter range for Ellison Ranching Company and W. T. Jenkins Company. This encounter with the sheep was on May 2, 1961. Rowher went to Austin on May 4 accompanied by Kirk Neilson, his assistant manager in the district. He had on May 5 prepared a trespass notice against Williams. On the 5th at Austin he oberved in a corral, referred to generally by its ancient name of the George Thorpe Corral, about a dozen head of yearling sheep. There was a black-face one in the bunch. Later he returned to the corral, found that the sheep and cattle had been let out, and followed their tracks to where they were found, a hundred yards or so away. Stanley Ellison, vice president and manager of Ellison Ranching Company, identified the sheep as those belonging to his company. He stated that the brands on some of them were still clear, though on many of them they were blotched. His brand was a pitchfork painted in red on the back, with the tines pointing forward. He also identified the earmarks. There was testimony as to foot tracks (apparently accepted by the jury as the foot tracks of Williams and his wife) following the sheep tracks out of the corral. There was also testimony identifying the dual tracks of Williams's truck in which the sheep had been hauled from where they had been seen on May 2 down to the corral. Rowher positively identified the sheep as the sheep he had seen on May 2 in Decker's possession.

Appellant contends that without Rowher's testimony thus identifying the sheep, the state's entire case falls. While this is not necessarily so, we may accept his statement for purposes of argument and decision.

Rowher was subjected to a grueling cross-examination, not only as to his competency to identify the sheep but on virtually every answer he gave to counsel's questions. He testified that yearling sheep were easily identified from older sheep; that it was customary also to dock the tails of the wether lambs a little longer than the tails of the ewe lambs; that there are also physical characteristics; "Oh, there is the masculinity, just

like a person, I mean they have certain physical characteristics * * * the features of sheep or any other animal and the fineness of the features in others, so by a casual observation you can tell"; that, asked about the type or breed, these were the Corradells [Corriedales] and the Rambolays [Rambouillets], the Rambolay being the foundation stock, with rather tight wool, shorter wool, not a rangy sheep, quite prominent wool toward the face; that the Corradells are more open-faced, longer staple in the wool, cleaner legged than the Rambolays and the Corradells, being about the same size and equally valuable for wool and mutton; that in the cross-breeding there are many characteristics in heredity of stock, some of them being dominant and some not, so that all gradings are encountered; that the black face would probably come from a Hampshire ram; that when he said the 14 head were of a uniform band, the uniformity was principally in the age; that it was not true that the only way to determine a sheep's age or that it is under a year old is by looking at his mouth, "Well, after they are lambed they have got all of the young lamb wool, they are with their mothers, as they grow older their wool becomes more long, their facial features are developed and a yearling sheep is not yet mature so that he does not have these manifest characteristics that a grown sheep would have." All of this was elicited in his cross-examination.

When the sheep stopped and Rowher was talking to Decker he had opportunity to count them, although he did not identify the brands or earmarks. As to his failure to identify the brands, he said: "Those are wool sheep that I saw. It was not discernible to me, any exact figure or character * * * just a patch." Appellant introduced in evidence a number of photographs of the terrain showing high sagebrush, and contends that it was impossible to make an accurate observation supporting a subsequent identification of the sheep. As to this, however, Rowher testified: "There is a slight gradient there, we were not much above them but we were above them so they were easily seen when we were looking

downhill." As to his ability to identify them as yearlings, he said: "Well, if you are acquainted with sheep, with their physical characteristics to the extent that I am in my own mind I know that they were yearlings. * * * A two-year old would have much longer, heavier fleece of wool on him than a yearling and some of it would be rubbed off from the comb from last year."

Stanley Ellison was likewise questioned as to identifying a yearling from an older sheep. He stated: "Well, you can distinguish them by looking at them, you can distinguish a yearling sheep and older sheep the same as you distinguish between you and I or you and another person. They have characteristics like a calf and a cow, technically you distinguish between a yearling sheep and an older sheep by their mouth but they are smaller, they have a fleece that is different and a fleece that has never been sheared looks different, their profile is different. They have a look in their face and they have a look in their body that is different."

It is true that the defendant produced two witnesses who stated that it was impossible to identify or distinguish one group of sheep from another group of sheep without reference to brands or earmarks, but it is evident that the jury discounted this testimony. It is also true that Williams's uncle testified that Williams had a half interest in a bunch of sheep run on the uncle's ranch and that in March Williams had taken some 14 or 15 head of sheep from the ranch and marked them with a red cross on the back. The inference sought to be drawn was patently that these were the sheep that Rowher had seen in Decker's possession. However, the uncle, William Theodore Gandolfo, had testified that the sheep Williams took from the Gandolfo ranch were "just mixed sheep * * *. They were mixed, young ones and old ones together, just the run of the sheep." He also testified that the condition of the painted red cross that Williams had placed on the sheep he took from the Gandolfo ranch, when Williams brought them back on May 2, was "plain as plain could be." It is most evident that this attempt to connect the 14 head of

yearlings with the mixed bunch of Williams's own sheep from the Gandolfo ranch was rejected by the jury.

Added to this was Williams's statement made to Rowher that the sheep he was accused of stealing were just a bunch of "leppy" lambs.

Appellant, in attacking Rowher's competency to identify the sheep, insists that his observation of them was quite casual and limited to his observation of bands of sheep about once a month in Lander County or slightly more often throughout his entire grazing district. As to this, Rowher had testified that his observation was probably of 15 or 20 bands a year and probably four times that many.[1] Appellant says: "If this limited experience is sufficient to make Rowher a sheep expert, there are innumerable hunters, fishermen, miners, prospectors, lawyers, and travelers who frequent areas in Nevada where sheep graze who are also 'sheep experts.'" This can hardly be said to be fair or logical comment. It was Rowher's business to look and to observe.

Appellant's argument seems to be that Rowher's statement that he could identify the 14 yearlings in the corral as being the same group he had seen with Decker is so inherently impossible, or at least so inherently improbable that it was error to overrule appellant's objection to its competency. He insists: "Even if Monte Rowher's qualifications in this respect were a matter of discretion, upon the record and Monte's own testimony, the admission of his opinion was an abuse of discretion because it conflicts so basically and unalterably with logic and common sense." This he says, in rejecting the theory that whether or not a witness possesses sufficiently superior knowledge, skill or experience to qualify as an expert witness, is addressed to the discretion of the trial court. Appellant contends that the subject of the inquiry does not admit of expert testimony in the first place. He contends that identification of range sheep "by casual observation" from afar in high brush cannot by any stretch of the imagination be said to be a subject which admits of expert testimony.

---

[1] The number of sheep in a band varies, but we may accept 2,000 as an average.

In the first place the observation as above-described was far more than casual. The rule is that the qualification of a witness to testify is largely addressed to the discretion of the trial court and that the determination of its weight is the function of the jury; and that the objection goes more to the weight than to the admissibility of the evidence.

In State v. White, 52 Nev. 235, 285 P. 503, a witness gave as his opinion, on direct examination, that a number of the bones, including a skull, found in the ruins of a burned cabin, were human bones. On cross-examination he stated that he had no professional knowledge of anatomy. On appeal error was assigned in the refusal to grant the defendant's motion to strike this testimony. This court said at 52 Nev. 261, 285 P. 510: "The mere fact that a witness disclaims being an expert as to a particular subject about which he testifies will not of itself render his opinion inadmissible. The question always is whether he has sufficient knowledge to enable him to give an opinion as to the matter concerning which he is questioned, and is always addressed to the sound discretion of the court. Underhill's Criminal Evidence (3d ed.), sec. 189."

In 2 Wharton's Criminal Evidence 360 (12th ed.), it is stated: "The testimony of experts is tested by the same rules that are applied to the testimony of other witnesses, and its weight and value are for the jury to determine." Later at id. 380 the author says: "The opinion, belief, judgment, or impression of an ordinary witness as to the identity of a person or an object is admissible in evidence, provided such testimony is based upon his own knowledge and not upon information furnished by another."

Appellant refers to the testimony of his witnesses to the effect that it is impossible to identify sheep other than by the brand and earmark and that Rowher's identification of the sheep without reference to brands or earmarks was accordingly incompetent. Something of a similar nature occurred in Wallen v. State, 338 P.2d 170 (Okla.Cr. 1959), where an expert testified that a

speed estimate from skid marks was impossible, because of the fact that a motor scooter had prevented the front wheels of the automobile in question from gripping the pavement. Nevertheless, the court held that it was not error to permit the highway patrolman to estimate the speed of defendant's automobile from the skid marks, citing Miller v. State, 9 Okla.Cr. 255, 131 P. 717, LRA 1915A, 1088, as follows: " 'The admissibility of the testimony of expert witnesses is a question of law for the determination of the court. The weight and credibility to be given to such opinions is a question for the jury alone to determine.' "

In a handwriting case an expert had testified that a signature on a questioned document was the same as that appearing in an admitted specimen. He admitted, however, that this was the result simply of "just normal visual examination." He made no photographs, no examination under a microscope, no other types of test. It was asserted that his testimony was incompetent. The court said: "While the particular method adopted by him might go to the weight of his testimony, it clearly does not warrant its rejection. The weight and effect of the opinion of the expert witness, or the results of comparisons of the handwritings, was a matter for the duly constituted arbiter of the facts." People v. Bullock, 166 Cal.App.2d 494, 333 P.2d 88. Many other cases are to like effect.

Appellant cites a number of cases in which a criminal conviction was reversed for failure of sufficient identification. These cases do not require discussion. The reversals in State v. Fronhofer, 38 Nev. 448, 150 P. 846, and in State v. Cerfoglio, 46 Nev. 332, 205 P. 791, 213 P. 102, 27 A.L.R. 848, meet with our entire approval, but under their facts they have no application to the present problem.

Appellant contends that the record discloses no substantial evidence to support the verdict; that "there is not a shred of competent evidence which connects appellant with the Ellison sheep or which is not consistent with a hypothesis of innocence." The emphasis here is

of course upon the word "competent." We have held that Rowher's testimony was competent. The 14 yearlings, identified as Ellison sheep, were being herded by Cecil Decker, appellant's employee, on May 2, 1962. Decker, called as a witness by appellant, testified that later that afternoon he saw the sheep at the corral at Cottonwood Creek in appellant's truck, into which he and appellant had loaded them, and that appellant then left with the sheep in the truck. Kirk Neilson, an employee of the Bureau of Land Management, together with Rowher and the forest ranger, had observed the sheep and cattle in the corral at Austin on May 5, 1962. Ten or fifteen minutes later when he returned to the corral with Rowher and Sheriff Maestretti, the corral gates were open and cow tracks and sheep tracks indicated that the cows and sheep had left the corral. Foot tracks, corresponding with the foot tracks of Mr. and Mrs. Williams, went down the road toward the corral gate, and then "over the top of the cow tracks going out of the corral." Raymond Ismay, manager of the Ellison Ranching Company's Fish Creek ranch, had observed Williams's truck going up the canyon and later observed its tracks coming back. He identified the tracks and identified the truck as belonging to appellant. He next saw the truck on May 7 in Austin. Appellant's connection with the Ellison sheep is as complete as can reasonably be expected.

Other errors assigned by appellant all have to deal either with the competency of Rowher's testimony or other sufficiency of the evidence. We find no error.

As there was substantial evidence to support the verdict of guilty, the judgment is affirmed.

McNAMEE, J., and BROWN, D. J., concur.

THOMPSON, J., being disqualified, the governor commissioned Honorable Merwyn H. Brown, district judge of the Sixth Judicial District, to sit in his place.