[No. 1,076.]

## THE STATE OF NEVADA, RESPONDENT, *v.* ROBERT ST. CLAIR, APPELLANT.

INSTRUCTIONS—FORM OF VERDICT—MURDER AND MANSLAUGHTER.—The court gave a proper definition of murder in the first and second degrees, manslaughter, and justifiable homicide, and instructed the jury to designate the offense, if any, of which the defendants should be found guilty. The court gave a form of verdict for "murder in the first degree," "murder in the second degree," and "not guilty:" *Held*, that the forms were merely given as a guide to the jury, and could not be considered to limit the rights of the jury to a consideration of the defendant's guilt to the two degrees of murder, and that the jury could not have been misled by the omission of the court to give a form of verdict for manslaughter.

IDEM—DUTY OF COUNSEL TO ASK FOR INSTRUCTIONS.—If counsel considered it important that a form of verdict for manslaughter should be given, it was their duty to prepare the same or request the court to give it.

NEW TRIAL—CONFLICTING AFFIDAVITS—MISCONDUCT OF JURORS.—In the case of a conflict in the affidavits on motion for a new trial on the ground of misconduct of jurors: *Held*, that it was the duty of the district court

to determine the question of veracity, and that its action in this respect will not, upon the showing made, be disturbed.

PRESUMPTIONS—CONDUCT OF JURORS—VAGUE RUMORS.—The presumption is that every juror is a man of ordinary intelligence, and that he acts conscientiously in the performance of his sworn duty, and that he would not be improperly influenced by vague rumors.

MODIFICATION OF INSTRUCTIONS.—*Held,* upon review of the instructions, stated in the facts of this case, that the modification made by the court could not have misled the jury to the prejudice of the defendant.

REFUSAL OF INSTRUCTIONS ALREADY GIVEN IN SUBSTANCE—NOT ERROR. It is not error to refuse instructions asked by defendant when the court of its own motion gave proper instructions upon the subject-matter em-braced therein.

APPEAL from the District Court of the Fourth Judicial District, Humboldt County.

On the trial of this cause, three witnesses, Campbell, Weill, and Mohler, testified that at the time of the homicide they were at work in an adjoining field about one hundred and twenty-five rods distant from the bridge where the body of deceased, Patrick Tully, was found; that Campbell and Weill were on an elevation about eight feet, and Mohler about two feet, above the ground; that there was grass growing in a field between witnesses and the bridge, but that no other object obstructed the view; that if a man on the ground at the scene of the homicide or anywhere in the vicinity of the deceased's house or the bridge was standing up, his person from his head down as far as his hips would be easily visible to said Campbell, Weill, and Mohler, but that the bridge was not visible to them at the time the shots were fired; that while they were so at work they heard a shot fired in the direction of and at the house and bridge; that immediately witnesses looked up and saw defendant in the act of firing a pistol in front of the house and right close to the bridge; after witnesses looked up they saw defendant fire three more shots; they heard the shots and saw the smoke from the pistol, and these were fired rapidly; that after the firing of these three shots had ceased defendant walked up a few steps and then squatted down so that witnesses could only see his shoulders, and witnesses could not tell what he was doing while so squat-

ted down; that after remaining a few seconds, defendant raised up and ran toward the door of the house and disappeared; that they could not see whether defendant entered the house or not; that defendant was out of sight for two or three minutes, and then reappeared and returned to the place where he had squatted down; that they then heard a shot from a much smaller pistol than the one from which the four first shots had been fired; that then defendant stooped down again, remained so a few seconds, got up and walked around the place and then walked away up toward the station and met some person on horseback, there halted, and soon turned around and came back to the bridge, there halted again for a few minutes, and then started on the road to his own house.

The defendant in his own behalf testified, that he was walking in front of the bridge when the deceased sprang forward, thrust his pistol across defendant's breast and fired a shot from a small pistol; that deceased also fired two other shots from the same pistol, which did not take effect; that defendant then drew the large pistol and deceased started to run toward the bridge, and as he did so defendant fired at him four shots from the large pistol, the first of which was fired just as defendant turned to run and struck deceased in the breast; that the other shots were fired rapidly while deceased was running and defendant was pausing; that deceased fell and expired on the bridge and laid in the position as before described. That when defendant found that deceased was dead, defendant was horrified and excited and started across the fields toward the house of Mr. Marzen, and had passed deceased's house, when he saw Michael coming from the station on horseback, and then defendant went back toward the bridge, and when he arrived there his pistol was accidentally discharged; that defendant then went up the road and met Michael and sent him back to the station for assistance; that defendant's pistol was loaded with conical balls and round balls; that the chambers which contained the round balls contained twice the amount of powder that the chambers did which contained the conical balls; that when they arrived at the

bridge they discovered the dead body of deceased lying on the bridge; that the first four shots were in their opinion from the same pistol, and that pistol was a large pistol; that the other shot was from a very small pistol.

The record states "that said witnesses Campbell, Weill, and Mohler did not, and neither of them did, and no witnesses in the case did state in testimony directly and in so many words, that said Campbell, Weill, and Mohler did not see at the time said shots were fired by defendant the deceased standing up; but there was evidence given in the case tending to prove that said Campbell, Weill, and Mohler did not and that neither of them did see Tully, the deceased, standing up at the time defendant fired said shots or either of them."

The defendant presented and asked to be given an instruction in the words following, to wit: "The jurors must not presume that the witnesses Campbell, Weill, and Mohler did not see Tully, the deceased, standing up at the time of receiving the fatal shot, or shots, unless the evidence shows to the contrary."

The court gave said instruction after adding the words following, to wit:

"But this does not mean that you must necessarily presume that said witnesses did see said Tully standing up at said alleged time, merely because there is no testimony herein of one or more witnesses, if such is the case, declaring directly and in so many words that said Campbell, Weill, and Mohler did not at said alleged time so see said Tully; for if the evidence in the case should satisfy your minds beyond a reasonable doubt that said Campbell, Weill, and Mohler did not so see said Tully at said alleged time, you would be perfectly justified in coming to the conclusion that said Campbell, Weill, and Mohler did not so see said Tully at said alleged time, even though no witnesses in the case have testified directly and in so many words that said Campbell, Weill, and Mohler did not so see said Tully at the said alleged time; and merely because said Campbell, Weill, and Mohler did not testify herein, directly and in so many words, that at said alleged time they did not see said Tully standing up,

it does not follow as a matter of law, either that said Tully was standing up at said alleged time, or that said Campbell, Weill, and Mohler, or either of them, saw said Tully standing up at said alleged time."

*M. S. Bonnifield*, for Appellant: ·

I. The court erred, in not giving the jury a form of verdict for manslaughter. (Hillyer on New Trials, 258; 22 Iowa, 270; *Garrett* v. *Gonter*, 42 Pa. St. 143.)

II. The instruction asked for by defendant relative to the testimony of the witnesses was pertinent and, proper. The modification by the court was erroneous. Where a presumption is one of fact merely, the court is not warranted in declaring it to the jury as a presumption of law. (Hillyer on New Trials, 284; *King* v. *Pope*, 28 Ala. 601, and cases cited.)

*M. A. Murphy*, Attorney General, for Respondent:

I. This court will not disturb the decision of the court in overruling the motion for a new trial upon the ground set out in the affidavits. (*Costly* v. *State*, 19 Ga. 628; *State* v. *Harris*, 12 Nev. 414; *State* v. *Jones*, 7 Id. 413; *Carnaghan* v. *Ward*, 8 Id. 33; *People* v. *Boggs*, 20 Cal. 434.)

II. The modifications and additions made to the instructions did not injure the defendant. The instruction asked by defendant attempted to instruct the jury upon a question of fact, and was to the effect that the jury must not consider the testimony of the witnesses Campbell, Weil, and Mohler, and without the modifications and additions given by the court, it took from the jury the right to consider and weigh said testimony and draw their own inference therefrom.

III. The judge is not bound to give the instructions asked, in the language in which they are framed; he may modify the charges so as to make them conformable to his own views of the law. (*State* v. *Turner*, 19 Iowa, 148; *State* v. *Collins*, 20 Id. 90; *Mask* v. *State*, 36 Miss. 94; *People* v. *Dodge*, 30 Cal. 450.)

By the Court, Hawley, J.:

Appellant, having been convicted of murder in the second

degree, appeals to this court, and claims that, upon several grounds, the court erred in refusing to grant him a new trial.

1. Did the court err in failing to give to the jury a form for a verdict of manslaughter? We think not.

The record shows that the jury was properly instructed as to what constituted murder in the first degree, murder in the second degree, manslaughter, and justifiable homicide; that the court also instructed the jury as follows: "Should you find the defendant guilty, you will designate, by your verdict, the offense of which you find the defendant guilty;" that prior to the commencement of the argument of counsel, and at the close thereof, the court asked counsel for defendant "to prepare and hand to the court any forms of verdict defendant might desire to have the jury place their verdict in;" that defendant's counsel prepared the form of a verdict of "not guilty," which the court gave to the jury, that the court of its own motion, gave the form of a verdict for "guilty of murder in the first degree" and "guilty of murder in the second degree." Upon these facts it is clear, to our minds, that the jurors were not misled, as claimed by appellant's counsel, into the belief that if they found defendant guilty they were confined in their deliberations, as to the degree of guilt, to the two degrees of murder. It was their duty, if they believed, from the evidence, that the defendant was guilty of any offense (and they were so instructed), to determine the degree of guilt from the evidence adduced at the trial. The forms were merely given as a guide to the jury in framing their verdict, and were not intended, and could not have been considered, to limit the right of the jury to a consideration of the defendant's guilt to the two degrees of murder. Moreover, if counsel for defendant considered it important that a form of verdict for manslaughter should be given, it was their duty either to prepare the same, or, at least, to request the court to give a form of verdict for each of the lesser degrees of guilt.

2. The court did not err in refusing to grant a new trial upon the grounds presented by the affidavits in the bill of exceptions.

The affidavits of Nagle, a person confined in jail for con-

tempt of court, and of the defendant, allege that, after the jury retired to deliberate upon a verdict, they heard the jurors discuss the question of the guilt or innocence of the defendant; that they heard three of said jurors vote not guilty; that some of the jurors said that if the jury would agree to a verdict of murder in the second degree they would recommend defendant to the mercy of the court; that they distinctly heard W. H. Woolcock, one of the jurors, say that he did not believe the defendant guilty, but if the jury would recommend the defendant to the mercy of the court he would support the verdict of murder in the second degree; that John Byrnes, one of the jurors, said to the others, in substance, that he knew the defendant went armed and was in the habit of knocking fellows over the head with his pistol; that he did not have any friend in the county and was a dangerous man. These statements are contradicted by the affidavits of the sheriff and the deputy sheriff, to the effect that it is impossible for any one in the jail, where Nagle and the defendant were confined, to distinguish anything that is said in the jury-room.

It was the duty of the court to determine the question of veracity presented by these conflicting affidavits, and its action in this respect will not, upon the showing made, be disturbed.

The attorneys for the defendant state in their affidavit "that the facts set out in the fifth ground of motion for new trial are, each and all, true, substantially as therein set out." The facts stated in this ground are as follows: "E. P. Torrey is, and at all times since said indictment was, professedly a warm friend of defendant; was called regularly as a juror in the case; was examined on his *voir dire* by both parties and passed, and was excused peremptorily by plaintiff. W. H. Woolcock, one of the jurors who tried this case, was, at the time the jury was impaneled, in the employ of said Torrey as foreman in a mine; had been so employed for several months, and ever since said trial has been in said employment. Within one or two days before the final submission of the case to the jury, by the court, the sheriff informed said jurors, and each of them, that it was rumored in

town that said Torrey had a conversation with said Woolcock at the hotel upon the occasion of said jurors taking supper there. John Byrnes, one of said jurors, informed the court in open court, of said alleged rumors, and asked that the matter might be investigated. The sheriff stated in open court that he had heard such rumors, and so informed the jury."

These affidavits, in so far as they state that the sheriff informed the jurors of the rumor, seem to be denied by the sheriff, who states, in his affidavit, that he "did not, during the trial of said case, speak to said jurors, or either of them, on the subject of said case, nor allowed any other person to speak to said jury, or either of them, on the subject of said case."

But how could the rumor have influenced the jury to the prejudice of the defendant? His counsel argue that the rumor was started for the purpose of intimidating the juror Woolcock, and to compel him to vote for a verdict of guilty through fear that if he voted otherwise people would say that he had been improperly influenced by Torrey. The natural presumption is that every juror is a man of ordinary intelligence, and that he acts conscientiously in the performance of his sworn duty. The affidavits of Nagle and the defendant being disregarded, there is nothing left in the record to show that Woolcock had any hesitation in voting for a verdict of guilty, or that he was in any manner influenced by the rumor of the reported conversation with Torrey.

The rumor was, at most, of a very indefinite and uncertain character. It was not reported that Torrey and Woolcock had any conversation about the case. That is left as a matter of inference. It is not even claimed that there was any foundation for the rumor, for there is no attempt to show, as a matter of fact, that any conversation whatever actually occurred between Torrey and Wcolcock after the jury was impaneled to try the case. Counsel simply claim that the rumor was started for a sinister purpose, and that it was used as a scarecrow to frighten Woolcock and keep him from voting for a verdict of not guilty.

The record fails to sustain this position. It is utterly untenable. It would be unreasonable for us to presume that any juror was improperly influenced by such a vague rumor.

3. The court did not err in giving the instruction, as modified, relative to the presumptions of the jury upon the testimony of the witnesses Campbell, Weill, and Mohler.

The modification was unnecessarily lengthy, and contained a useless repetition of words; but we are unable to see how the jury could have been misled thereby to the prejudice of the defendant. It was the duty of the jury to determine the question whether, at the time of the homicide, the deceased was standing up or lying down, from all the facts and circumstances surrounding the case, and not to draw any presumption from the mere fact that the witnesses Campbell, Weill, and Mohler did not, in so many words, directly state that they did not see the deceased standing up.

4. The action of the court in refusing to give the instructions "E" and "K," asked by defendant's counsel, is sustained, upon the ground that the court, of its own motion, gave proper instructions upon the subject-matter embraced therein. (*State* v. *O'Connor*, 11 Nev. 416; *State* v. *Rover*, 13 Id. 18; *State* v. *Hamilton*, Id. 386.)

The judgment of the district court is affirmed.