## STATE v. WHITE

No. 2857

March 5, 1930. 285 P. 503.

*H. U. Castle* and *Cantwell & Springmeyer*, for Appellant:

*J. L. Clark,* District Attorney, *M. A. Diskin,* Attorney-General, *Wm. J. Forman,* Deputy Attorney-General, *J. M. McNamara* and *Ioannis A. Lougaris,* for Respondent:

244

## OPINION

By the Court, DUCKER, C. J.:

The appellant was convicted in the district court of Elko County of the crime of murder of the first degree. The jury did not exercise their discretion to fix the punishment, and the court imposed the penalty of death. This appeal is from the judgment and order denying appellant's motion for a new trial. As it was argued most earnestly that neither the corpus delicti nor appellant's guilt were proved sufficiently to warrant the verdict, a statement of the case is deemed advisable.

In the month of February, 1928, in the city of Elko, Mike Connis and Louis Lavell, who were then associated together in gambling, entered into a gambling scheme with appellant. The scheme was proposed by appellant.

By the terms of this arrangement Connis and Lavell were to furnish marked cards to be used in gambling games in the Commercial Hotel in Elko. Appellant was to get the marked cards into the games. Connis and Lavell were to play and give appellant twenty-five per cent of the winnings. The scheme was carried out accordingly, and the parties divided more than $2,000 as the result of the winnings. The parties met in the country to divide the spoils. Connis and Lavell occupied adjoining rooms in the hotel, and the cards were marked by them in the latter's room. On the evening of May 4, 1928, Lavell played in the game in the hotel and won $680. On the evening of May 6, 1928, Connis and Lavell were together in the lobby of the Commercial Hotel. Lavell then had on his person $1,050 or $1,100 in paper money in denominations of one hundred, twenty and five dollar bills. He had in his possession a diamond ring. He wore a stickpin in his necktie, and carried a watch. On the night before he had in his possession a loose diamond valued at $325 or $350. He usually carried this diamond in his trouser pocket, wrapped up in cotton and tissue paper. He was wearing a blue suit and a light hat. Lavell was in the habit of carrying large sums of money on his person, and this habit was known to appellant. Between the hours of 10:30 and 11 o'clock Sunday evening May 6, 1928, he left the lobby of the hotel, going through the front door. As he was leaving, he said, "I want to see Bob." The appellant was then standing in front of the hotel. He was seen at this time talking to the appellant for a few minutes, and then to get into a car with him and ride away. Lavell was never seen again.

A building called the Hesson powder house is situated in a small ravine about one and one-half miles easterly from Elko and about a quarter of a mile north of the Victory highway. Appellant was seen in a car coming from near this powder house between 4 and 6 o'clock on the afternoon of May 6, 1928. On the same evening at 11 o'clock, or 7 or 8 minutes therafter, appellant was seen at this powder house sitting behind the

wheel of a car, and, when the persons who saw him drove by his car, appellant drove away and into Elko at a rapid gait.

On the day of May 6, 1928, the appellant had a rug or mat on the floor of his car between the seats. On the following day there was no rug or mat in the car, and appellant told the witness who asked him where it was that he had taken it out because he was hauling whisky and did not want it cut up with the kegs. There was a gun, a piece of canvas, and a laprobe in the car on the afternoon of that day, and in the forenoon of the same day a witness saw two square five-gallon cans, a piece of canvas three or four feet square, and a gun in the car. This witness thought the gun was a 16-gauge, single barrel shotgun. The witness had seen the gun in the car before quite often. On the afternoon of May 6, 1928, appellant was seen unloading at his home a couple of boxes, which had red labels on them, and which, to the witness, looked like cases in which gasoline cans are carried. Appellant bought a case of gasoline on Saturday, May 5, 1928. This case was placed in the back of his car. The witness thought appellant said he was going to return some of the gas he had borrowed in the country. Immediately afterwards he said he was going out in the country; that gasoline was pretty high, and he was going to carry some with him. Appellant tried to buy a flash light in the Victory garage in Elko on the night of May 6, 1928, between the hours of 10:30 and 11 o'clock, and was told that he might get one at the Mayer garage. Between twenty minutes to 11 and 11 of the same evening, or about that time, appellant borrowed a flashlight at the Mayer garage in Elko.

On the evening of Tuesday, May 8, 1928, somewhere between the hours of 1:30 and 2, or about that time, appellant came to the Mayer hotel in Elko and engaged a room. At this time he made an engagement with the clerk of the hotel to go fishing with him and Mr. Mayer, the manager of the hotel, on the next day and to take his (appellant's) car for the expedition. The clerk took

him to his room. He saw appellant next morning when he came down from his room, and told him that he had a flat tire on his car. Early on the morning of the 8th appellant came into the hotel and told Mr. Mayer that he could not go fishing; that he was going to Currie to look at some horses. About 8:30 that evening appellant telephoned to the clerk of the Mayer hotel, and told him that he would not want the room that night, as he was going to stay home. Monday evening, May 7th, at about 6:30 or 7 o'clock, Connis saw appellant come into the Commercial Hotel, and the following conversation took place:

"Q. State the conversation. A. When he came in he says, 'Hello, Mike,' I says, 'Hello, Bob, where's Louis?' He says, 'I didn't see Louis.' I says, 'You didn't see him —you was with him last night.' He says, 'No, I didn't see him.' So I says, 'My God, there is something terrible happened. * * *'

"Q. Did you have any further conversation? A. Yes, sir, I says, the minute I asked him if he saw Louis and he says no, and I told him he is with Louis, something terrible happened to him, and I turned around to tell Red. I said, 'My God, Louis is a dead man by now,' and of course I saw Mr. White. He turned kind of pale and was kind of nervous.

"Q. Did he reply to that. Did he make any reply? A. No, sir."

Connis saw appellant at the Mayer garage in Elko the next morning at about ten minutes past 7 o'clock. In reply to a question concerning this meeting, Connis said, "Well, before we got about ten feet he spoke to us. He says, 'Good morning, boys.' I said, 'Good morning, Bob.' He says, 'Did you find out anything about Louis yet?' I says, 'No, you ought to know better than we do because you was with him Sunday night.' He says, 'No, I didn't was with him.' I said, 'You were outside of the Commercial Hotel between 10:30 and 11 o'clock Sunday night.' He says, 'Yes, I was, but,' he says, 'I left him and went home and stayed all night and the time I got in home,' he says, 'my wife asked me what time it was

and on account of my watch was stopped I can't tell the time and I called up central and central told me it was about 11 o'clock.'"

Ed. Kendricks, deputy sheriff of Elko County, saw appellant Monday night, May 7, 1928, in his Packard car in front of the Mayer Hotel around 10:30 or 11 o'clock. He did not see him later that evening, but saw his car parked in front of the Mayer Hotel around 3 o'clock of 3:30 the next morning, and observed the condition of the car at that time. There was a flat tire on the rear left wheel, and the car was very dusty. When Kendricks saw the car earlier in the evening, it did not seem to be very dusty. There was a great difference in the appearance of dust on the car at 3 o'clock and when the witness saw it at about 11 o'clock.

Two or three years prior to the disappearance of Lavell, appellant and his wife occupied a cabin situated in Secret Valley about thirty-six miles southeast of Elko. The place on which the cabin was situated was known as the "Ryan Place," and the cabin as the "Ryan Cabin." Some time during the Monday night, May 7, 1928, this cabin was completely destroyed by fire. The road from Elko to the Ryan cabin at this time was described as good. On the morning of Tuesday May 8, 1928, at about 5 o'clock appellant was seen at the Mayer garage. He had a tire repaired, bought some gasoline, and said he was going to Cobre to look at some horses.

At about 7:30 or 8 o'clock Tuesday morning, May 8, 1928, appellant was seen by Morley Murphy and John McKissick at the 71 mail post, which is about five miles from the Ryan cabin in the direction of Elko. Appellant was in a Packard sedan, and overtook them at this point where they stopped on account of a flat tire. He was driving fast. He loaned them his jack to jack up their car, and told them he was going to Currie to see about some horses. At this time Murphy did not know that the Ryan cabin was burned, and there was no conversation about it. Murphy and McKissick continued on their journey, and arrived at the Ryan place a few minutes afterwards, and found that the Ryan cabin had

been burned. They saw appellant there. When they arrived, he was the only person there, and was down by an old cabin about one hundred and fifty feet from the ruins. W. B. Wright met appellant on the Halleck Secret Pass road about a quarter of a mile south of the Ft. Halleck lane. Appellant was in his car. He told the witness he was going to Odgers. Witness thought the time about 8:30 in the morning. About twenty minutes later Wright saw appellant at the Ryan ranch, and also saw Murphy and McKissick there. In the ruins made by the fire were seen at the time three or four cans which the witness Wright described as "empty gasoline cans or honey cans or oil cans." They were square five-gallon cans with the tops in them. The cans were burned and charred by the fire. He also observed a hoe lying about five feet from the ruins. The hoe had black stains on the metal part. These stains extended up the handle about a third of the way. Concerning the hoe, the witness Wright further testified: "I picked up the hoe and I said, 'It's a cinch some one has been here since the fire because this hoe has been in the fire.' No remark was made immediately, and I again said, 'How do you suppose this hoe got there? Certainly a person wouldn't attempt to fight a fire with a hoe.' " Mr. Murphy spoke up and said, 'Yes, Bob, what do you think of that?' Then Mr. White responded, 'I threw that out there a few minutes ago; I was raking over all this old harness.' "

During the time these persons were there with appellant, he seemed to one of them to be watchful of their movements. One of the witnesses, Mr. Wright, described appellant's appearance at that time "as though he had been working or making a long drive, or possibly drinking, or had been up all night, I make that statement on the basis of his eyes, rather a gone expression, and bloodshot."

Thereafter, on the same day between 11 and 12 o'clock, appellant met Wilbur Gardner several miles beyond the Ryan Ranch, and asked Gardner if he had heard of the fire. He told him he had better stop and

look at it as he went by. He also told Gardner that Morley Murphy had told him about the fire. Shortly afterwards near the same place he met Elton Cooley. Cooley was unable to remember who it was appellant said told him about the fire, but that it was either Wright or Murphy.

While hunting rabbits on the afternoon of May 8, 1928, a man by the name of Emerson Elliot found a hat in a small gulch about 20 feet from the Hesson powder house. There were a few bloodstains within a foot or so of the hat. The hat was cut and torn. Elliot left the hat where he found it, and notified the sheriff. The sheriff and Elliot immediately returned to the place, and the former took the hat into his possession. It was the opinion of the sheriff, who had had experience in firearms extending over a period of eighteen years, that the rent in the brim of the hat was caused from the charge of a shotgun fired from a close distance. Besides the tear in the hat, there were a few little holes made by shot, and there were powder marks on the hat. The hat was identified at the trial of the case, and the witness Connis testified that it was the same kind of a hat worn by Lavell on the night of his disappearance. Several bloodstains were observed on the ground near the hat. Portions of these bloodstains were tested by a witness who qualified as an expert, and found to be human blood. A human head hair was discovered in one of these bloodstains. This head hair was submitted for examination and comparison with a number of other hairs taken from the wearing apparel of Louis Lavell found in his room shortly after his disappearance to Professor Heinrich, an expert criminolgist, who testified that they were identical; that these head hairs came from the same head. It was the opinion of Heinrich that the charge of shot which caused the rent in the hat found at the powder house came from slightly above and in front of the wearer of the hat, with the muzzle of the gun held at a distance of approximately not over one yard or less than one foot from him. It was his opinion

that a person was wearing the hat when the rent was made in it.

On the morning of May 9, 1928, Sheriff Harris and one of his deputies went to the Ryan place, and made a search in the ruins of the burned cabin. They found some bones, a belt buckle with the letters L. O. U. I. S. engraved on it, a pocketknife, the remains of a metallic pencil, couple of spectacle cases with the remains of spectacles inside, a cuff button, and the top of a tobacco sack. J. L. Clark went to the scene of the fire on June 2, 1928, in company with witness Heinrich. They found in the ashes a stickpin and knot of a knit necktie. The belt buckle, pocketknife, spectacle cases and contents, the cuff button, the top of tobacco sack, and stickpin were all identified by Connis as the same kind worn or carried by Lavell on the night of his disappearance. The former testified that the latter wore a knit necktie and carried a metallic pencil. The bones found in the ruins were determined by experts to be human bones, detailed as portions of a skull, the lower jaw, kneecap, leg bone, two of the bones of the forearm, and a number of teeth. Two shot were sticking to the inner surface of one portion of the skull. The platinum bridge was positively identified by a dentist as one he had made and placed in the mouth of Lavell thirteen years before. He testified that it was the only platinum bridge he had made. The jawbone was identified as the one on which the bridge was placed. The platinum bridge was also identified by another dentist as having been seen by him in Lavell's mouth on an occasion when he cleaned the latter's teeth. He testified that it was the only platinum bridge he had ever seen in a patient's mouth.

On the afternoon of the 7th of May appellant's wife left Elko on the train bound for Ireland. She was charged with complicity in the murder of Lavell, and arrested in New York City and brought back to Elko. When arrested, she had in her possession two one hundred dollar bills, four fifty dollar bills and five twenty dollar bills. She was later released from the charge. On the morning of May 9, 1928, appellant

left Elko. He said he was going to Winnemucca, and that one Austin Cannon was going with him. He appeared in Rawlings, Wyo., between 3 and 4 o'clock in the morning of May 10, 1928. He left his Packard sedan there in a private garage. He told the owner of the garage that he was going to Cheyenne to see his brother, and that he would return the following Friday or Saturday. He never returned. He was later arrested in Chicago on the charge of murder of Louis Lavell and brought back to Elko. Connis swore to the complaint charging him with the offense.

In the forepart of June the sheriff went to Rawlings and obtained appellant's car from the man in whose garage it was left by appellant and brought it to Elko. The rug found in the car between the seats was not the rug that was in the car on the 6th of May. Some bloodstains appearing on the metal strip over the sill of the back door of the car on the right side were submitted to an expert and found to be human blood. The foregoing is a statement of the undisputed facts, or such as the jury would have been justified in finding from the evidence.

The evidence presented by the appellant tended to show that appellant could not have been seen in front of the Commercial Hotel in company with Lavell, or at the Hesson powder house on the night of May 6th, between 10:30 and 11 o'clock, as testified to by the state's witnesses; that he could not have taken the body of Lavell to the Ryan cabin on the night of May 7th in accordance with the theory of the prosecution; that appellant borrowed the flash light on the night of May 6th for the purpose of using it in search for some whisky that was hid in the sagebrush several miles from Elko; that appellant frequently carried a gun in his car; that appellant had no money when he was arrested in Chicago; that Lavell did not wear the kind of eye glasses found in the ruins of the fire; that the blood found on the metal strip of appellant's car came from the bleeding nose of a little boy who was riding in the back seat and was thrown against the

front seat by the sudden stopping of the car; that the circumstances of appellant and his wife leaving Elko for the east and Ireland did not indicate flight; that Connis had a motive and the opportunity to do away with Lavell; and that he acted peculiar and displayed a large roll of bills on the night of Lavell's disappearance.

It is apparent from the verdict that the jury rejected, or considered of little weight, the evidence presented by appellant and other circumstances relied upon by him as establishing a defense. The facts established by the evidence presented by the state, or proved, at least to the extent that the jury were justified in finding them to be true, made a very strong case of circumstantial evidence indicating the manner of the death of Louis Lavell at the hands of appellant on the night of May 6, 1928, and that it was felonious to the extent of first degree murder. The facts established were of sufficient probative force to support the verdict, and consequently our inquiry can go no further as to the ground urged. Nothing is better settled by the decisions of this state than that this court is without jurisdiction to disturb a verdict in a criminal case on the ground that it is contrary to the evidence when there is substantial evidence to support it. The corpus delicti may be established by circumstantial evidence. State v. Cardelli, 19 Nev. 319, 10 P. 433.

It is stated in appellant's brief that he could have done all the things the state claims he did and still be absolutely innocent of the crime charged. This may be true, but it is not a statement of the rule applicable to the evidence in a criminal case. A chain of evidence could scarcely be made so strong as to exclude the possibility of innocence. If it is sufficient to exclude every other reasonable hypothesis than that of guilt, it will support a verdict.

The several particular instances in which appellant challenges the evidence for insufficiency we need not discuss. Some of these are instances of conflicting evidence, and all go to the probative force of evidence.

Inquiry as to these objections is foreclosed by the verdict of the jury.

It is alleged that the trial court committed reversible error in permitting the complaining witness, Connis, to testify to the fraudulent scheme whereby money was won and divided between the witness, Lavell, and appellant. Section 6463 of the Rev. Laws reads:

"Every person who, by color, or aid of any trick or sleight-of-hand performance, or by any fraud or fraudulent scheme, cards, dice, or device, shall win for himself or for another any money or property, or representative of either, shall be punished by imprisonment in the state prison for not more than ten years."

■■■■ The contention is that the evidence of the fraudulent scheme with cards was immaterial; that it showed the commission of a felony in violation of the foregoing statute, and was prejudicial. If the admission of the evidence were conceded to be error, its prejudicial effect may be reasonably doubted. Counsel for appellant did not by objection point out that the evidence tended to prove another crime, nor request the court for an instruction limiting its purpose for that reason; nor is there anything otherwise in the record showing that the evidence tended to prove an independent offense. It is therefore quite probable that the jury were not aware that the acts shown by the evidence had been made a crime by statute. Any prejudice in the minds of the jurors caused by the moral obliquity of the acts must have been neutralized by the fact that the complaining witness and Lavell were equally culpable. But, be the question of prejudice on account of the legal or moral wrong of the card conspiracy as it may, there was no error in the admission of the evidence concerning it. The evidence was offered by the state for the purpose of showing motive. The prosecution may always offer evidence tending to show motive, State v. Larkin, 11 Nev. 314, and the inquiry is often of great importance, particularly in cases of circumstantial evidence. "Any evidence that tends to

show that the defendant had a motive for killing the deceased is always relevant as rendering more probable the inference that he did kill him." Underhill, Cr. Ev. (3d ed.) p. 716.

It may always be proved regardless of any collateral effect it may have in showing, or tending to show, the commission of another offense by the accused.

Addressing himself to this point, Mr. Wharton, in his work on Criminal Evidence, says: "But in those cases in which the evidence of the crime charged is for the most part or wholly of a circumstantial character, motive frequently becomes a powerful aid in identifying the accused, and thus connecting him with the commission of the crime. And where, on the trial of a criminal action, evidence is offered which is competent proof of the presence of motive in the mind of the accused, such evidence is not to be rejected because it also shows, or tends to show, a distinct and different crime." Wharton, Cr. Ev. vol. 1 (10th ed.), p. 145.

It is stated in 8 R. C. L., at pages 201 and 202, that: "Whenever mental state, scienter, or quo animo constitutes an ingredient of the offense charged, evidence is admissible of acts, conduct or declarations of the accused which tend to establish such knowledge, intention or motive, notwithstanding the fact that it may disclose a different crime in law."

In the treatment of this phase of criminal evidence in Underhill's Criminal Evidence (3d ed.), p. 205, it is said: "Thus, the fact that the evidence introduced to prove the motive of the crime for which the accused is on trial points him out as guilty of an independent and totally dissimilar offense is not enough to bring about its rejection, if it is otherwise competent."

The following statement of the law in this respect is made in 16 C. J. p. 590: "Evidence to show the motive prompting the commission of the crime is relevant and admissible notwithstanding it also shows the commission by accused of another crime of a similar or dissimilar character."

The foregoing views of the law in regard to the incidental proof of crimes in a criminal case are amply supported by the decisions.

In view of all the circumstances of the case, the evidence was admissible under this well-recognized exception to the general rule.

■ It was for the jury to say from a consideration of the entire evidence whether the killing of the deceased was induced by the desire to rob him. If such a fact was found by the jury, there was evidence tending to support the conclusion. The evidence concerning the marked cards, if believed by the jury, established intimate relations between appellant and deceased in a nefarious plot by the execution of which deceased came into the possession of a considerable sum of money shortly prior to his disappearance. It tended to show, also, together with other circumstances, that the possession of this money by the deceased on the night he was slain was known to appellant, and may have furnished the inducement for the killing. The weight of it all was for the jury.

Error is assigned to the ruling of the court in permitting witnesses Wellman and Connis to testify to a statement by Lavell as he was leaving the lobby of the Commercial Hotel on the night of May 6, 1928. The former said that Lavell said to Connis: "I want to see Bob," and the latter said he said: "I am going to meet Bob." It is contended that it was not admissible because it was not made in the presence of appellant and was not a part of res gestae. On both occasions of the giving of this testimony, the trial court orally instructed the jury that the testimony was admitted solely for the purpose of explaining the purpose, motive, or intention of Louis Lavell in leaving the lobby of the Commercial Hotel, and must be considered solely in so far as it might explain such intention, purpose, or motive. The ruling was correct. It was permissible for the state to show by any competent evidence that deceased was last seen in company with appellant. If deceased intended to meet him at the time of his leaving the lobby, the

declaration was relevant to be considered in determination of the inquiry as to whether he actually did meet appellant at that time. Appellant was sometimes known as "Bob White"; consequently the declaration considered in connection with other circumstances would bear an inference that deceased had appellant in mind in making the declaration. The declaration was apparently not the result of premeditated design. Such declarations are "regarded as verbal acts from which the state of mind or intention may be inferred in the same manner as from appearance, behavior, or actions generally." 16 C. J. 641; Mutual Life Ins. Co. v. Hillmon, 145 U. S. 285, 12 S. Ct. 909, 36 L. Ed. 706. On this theory generally, rather than on the theory that such declarations are a part of the res gestae of the main transaction, are they held admissible when relevant. The reason of their admissibility is quite well stated in the following statements:

"Declarations of a person as to his present mental condition made under circumstances excluding suspicion may be competent as evidence of his intention at that time. Such declarations are admitted not altogether under the rule of res gestae or because they are deemed as strictly a part of the principal transaction in dispute, but because they are regarded as indicative of the frame of mind of the declarant as to some act growing out of the principal transaction, and exhibited under such circumstances or conditions as to make it reasonably certain that it was not the result of a premeditated design to prepare a statement of the fact. In other words, the declarations are regarded as verbal acts from which the state of mind may be inferred in the same manner as it may be inferred from the actions of the party generally. Upon this theory the declarations of a deceased upon his departure to meet the defendant, as to his destination and purpose are admissible in evidence." 8 Cal. Jur. sec. 188, pp. 90, 91.

In Commonwealth v. Phelps, 209 Mass. 396, 95 N. E. 868, 874, Ann. Cas. 1912B, 566, in ruling upon a declaration of this character, the court said: "Under the

defendant's objection and exception the judge allowed the commonwealth to prove that on his arrival at Monroe Bridge Haskins [deceased] said: 'Si is at it again.' This was admissible to prove that Haskins did suspect that the defendant had committed a crime. The judge in his charge instructed the jury that it could not be used by them to draw any inferences of fact that any act had been done by the defendant, but only to show the state of mind of Haskins at the time, with a view to any light it might throw upon his action in connection with his proceedings in making the arrest. This exception must be overruled."

Declarations of this character are admissible according to the great weight of authority, from which may also be selected: People v. Fong Sing, 38 Cal. App. 253, 175 P. 911; State v. Power, 24 Wash. 34, 63 P. 1112, 63 L. R. A. 902; State v. Mortensen, 26 Utah, 312, 73 P. 562, 633; State v. Pearce, 87 Kan. 457, 124 P. 814, Ann. Cas. 1913E, 358; Mutual Life Ins. Co. v. Hillmon, 145 U. S. 285, 12 S. Ct. 909, 36 L. Ed. 706; 1 Greenleaf on Evidence, sec. 108.

Moreover, there was evidence tending to show that Lavell did meet appellant immediately after the former left the hotel.

It cannot be maintained that there was any error in the court's refusal to admit in evidence the testimony of certain witnesses for appellant to the effect that shortly before the killing of Lavell the witness Connis declared that he had his car in "soak" in Reno for $1,000, and had to make some money to get it out; and also testimony tending to show that shortly after the disappearance of Lavell the car was in Elko. It is, of course, always competent for a defendant to introduce any legitimate evidence tending to show that some other person is guilty, but the proferred evidence must clearly appear to have such tendency. It must be such as directly connects the other with the corpus delicti.

The correct rule is, in our opinion, stated by the court in Greenfield v. People, 85 N. Y. 76, 39 Am. Rep.

636, and quoted with approval in State v. Louie Moon, 20 Idaho, 202, 117 P. 757, 758, Ann. Cas. 1913A, 724. The court said: "While evidence tending to show that another party might have committed the crime would be admissible, before such testimony can be received, there must be such proof of connection with it, such a train of facts or circumstances, as tend clearly to point out some one besides the prisoner as the guilty party. Remote acts, disconnected, and outside of the crime itself, cannot be separately proved for such a purpose." See, also, 8 R. C. L. p. 185.

Standing alone, the evidence proferred did not tend to connect Connis with the killing, nor did it tend to incriminate him, taken in connection with any other evidence in the case. There was nothing in the evidence tending directly to connect Connis with the killing. In the absence of such incriminating evidence, the evidence proferred by appellant, and the other circumstances appearing in the record which it is claimed point to the guilt of Connis, are just as consistent with his innocence. Therefore, the testimony offered as to the declaration of Connis as to his car was entirely negligible in probative value and inadmissible under the rule stated. The decisions relied on by appellant as to this contention do not at all resemble the instant case as to the facts involved.

There was no error in the refusal of the court to permit the witness Connis to testify on cross-examination as to whether he had his car in "soak" in Reno for $1,000. It was immaterial for the reasons already stated in this opinion, and was not proper cross-examination.

Appellant contends that it was the trial court's duty to instruct the jury, limiting the purpose for which they could consider the testimony of the witness Connis to the effect that a conspiracy had existed between appellant, Connis, and Lavell to commit a felony with marked cards, and that the failure of the court to do so was error. We do not think so. If appellant's counsel thought that an instruction of this kind was proper, it was

incumbent on him to have prepared such an instruction and requested the court to give it. State v. Smith, 10 Nev. 106; State v. Davis, 14 Nev. 407; State v. St. Clair, 16 Nev. 207; State v. Blaha, 39 Nev. 115, 154 P. 78; State v. Switzer, 38 Nev. 108, 145 P. 925.

We are referred by counsel for appellant to the case of State v. McFarlin, 41 Nev. 486, 172 P. 371, but we do not think it is an authority in support of his contention. That is a case of embezzlement, and evidence of other shortages than that charged in the information was admitted upon the trial of the case. While one of the justices used language in his opinion which seems to indicate that he believed it incumbent upon the court upon its own motion to instruct the jury limiting the purpose of the evidence as to other shortages, the case does not hold that it would have been prejudicial error not to so instruct, in the absence of a request for it. However, such an instruction was highly proper to be given in that case, particularly to guard against the danger of a conviction for a shortage other than the one charged in the information. In the instant case there was no danger of appellant being convicted of a fraud with marked cards.

█ The testimony of the witness Heinrich to the effect that certain hairs found on the clothing of Lavell were identical to a hair found in one of the stains of blood near the powder house was properly admitted. The witness was shown to have special knowledge in this respect, and his opinion was based thereon. A sufficient foundation was laid for the assumption that the hairs found on Lavell's clothing came from his head. The fact that there was room for doubt in this regard affected the weight rather than the competency of the opinion of the expert witness.

█ The witness Heinrich gave as his opinion on direct examination that a number of the bones, including a skull, found in the ruins of the Ryan cabin, were human bones. On cross-examination the witness stated that he had no professional knowledge of anatomy, and counsel for appellant moved to strike the testimony of

the witness relating to the bones, on the ground that he was not an expert as to that line of testimony. The refusal of the court to grant this motion is assigned as error. The mere fact that a witness disclaims being an expert as to a particular subject about which he testifies will not of itself render his opinion inadmissible. The question always is whether he has sufficient knowledge to enable him to give an opinion as to the matter concerning which he is questioned, and is always addressed to the sound discretion of the court. Underhill's Criminal Evidence (3d ed.), sec. 189.

The witness Heinrich was a consulting criminologist, and had followed this profession for eighteen or nineteen years. He qualified as an expert in his line of work, and counsel for appellant admitted his qualifications. In pursuing his investigations in criminal matters during these years, he had come to know something of anatomy by reason of his work. He had seen skulls which he knew to be human skulls. The weight of his opinion to the effect that the bones exhibited to him were human bones was for the jury, and there was no misuse of discretion on the part of the court in retaining the testimony in the record. Moreover, there was other testimony to amply justify the jury in concluding that the bones found in the ruins of the Ryan cabin were human bones. This would have cured error in that regard if there had been any error. State v. Johnny, 29 Nev. 203, 87 P. 3.

The court received in evidence the testimony of a witness to the effect that, after appellant's car had been returned from Wyoming to Elko, he discovered a stain on the metal strip used for a sill under the back door of his automobile on the right-hand side, which appeared to be a bloodstain. The metal strip was submitted to Professor Heinrich and Dr. Victor for an examination. The former testified that the stain was of blood, and the latter that it was human blood. Brown's testimony was objected to, and it is claimed that no proper foundation was laid for its admission, in that it was not shown that the car when Brown saw

the stain on the strip was in the same condition as it was when appellant left it in the private garage in Rawlings, Wyoming. It is true that the foundation laid did not show absolutely that there had been no change in the condition, but enough was shown to justify the inference that its condition was unchanged. When this had been done, circumstances which tend to show that the proof is not conclusive go merely to the weight and not to the admissibility of the evidence. A prima facie showing is sufficient. "Clear, certain and positive proof is not required." 16 C. J. 619; Underhill's Criminal Evidence (3d ed.), sec. 101, p. 106.

Continuous custody of the car by the witnesses who had such custody was shown by their testimony from the time it was left by appellant in a private garage in Rawlings, Wyoming, until Brown took charge of it and discovered the stain on the metal strip.

It is unnecessary to set out this testimony in detail, but it is to the effect that there was no change in the condition of the car. It does not exclude the possibility of others having access to the car; but it does show that it was quite probable that the stain did not come upon the metal strip during the time covered by the testimony laying the foundation. There was, therefore, no error in the admission of Brown's testimony.

We have considered all of the contentions made by appellant, and find no error. The accused, in our opinion, received a fair and impartial trial.

As no error appears in the record, the judgment and order appealed from are affirmed, and the district court is directed to make the proper order for the carrying into effect by the warden of the state prison the judgment rendered.

### ON PETITION FOR REHEARING

April 23, 1930.

*Per Curiam:*

Rehearing denied.